**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**LEA REICH**, on behalf of herself and
all others similarly situated,

     Plaintiff,

  -against-

**MIDLAND CREDIT MANAGEMENT,
INC., MIDLAND FUNDING, LLC, and
ENCORE CAPITAL GROUP, INC.**,

    Defendants.

Civil Action No:

1:15-cv-07195-JG-RML

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO COMPEL ARBITRATION

---

Joseph A. Hess (JH1964)
Marshall Dennehey Warner
Coleman & Goggin
*Attorneys for Defendants,*
*Midland Credit Management, Inc.,*
*Midland Funding, LLC and*
*Encore Capital Group, Inc.*
Wall Street Plaza
88 Pine Street, 21st Floor
New York, New York 10005
T: (212) 376-6438
F: (212) 376-6490
JAHess@mdwcg.com

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................. 1

II.  STATEMENT OF FACTS ...................................................... 2

III.  PROCEDURAL HISTORY .................................................... 6

IV.  ARGUMENT ...................................................................... 7

  A.  The Federal Arbitration Act Requires Enforcement of Valid Arbitration Agreements .................................................................. 7

    1.  Requirements for Arbitrability Under the Federal Arbitration Act ....... 7

    2.  Plaintiff Bears the Burden of Proving Her Claims are Not Arbitrable .. 8

    3.  The FAA Provides a Strong Presumption in Favor of Arbitration ........ 9

  B.  The Terms & Conditions Are a Contract Evidencing Transactions in Interstate Commerce ...................................................... 12

  C.  The Agreement at Issue Contains Valid and Enforceable Arbitration Provisions ............................................................... 14

    1.  The Parties had an Agreement to Arbitrate ...................................... 14

    2.  Midland, as Successor to all Rights Relating to Plaintiff's Account, May Enforce the Arbitration Agreement Contained in the Terms & Conditions ........................................................................ 15

  D.  Plaintiff's Claims Against Defendants Fall Within the Broad Scope of the Arbitration Provisions of the Terms & Conditions........................ 16

    1.  The Arbitration Provisions of the Terms & Conditions are Broad in Scope............................................................................... 17

    2.  The Presumption in Favor of Arbitrability is Heightened Where the Arbitration Agreement in Question has a Broad Scope. .................. 18

    3.  Plaintiff's FDCPA Claims Fall Within the Broad Scope of the Arbitration Provisions of the Terms & Conditions ........................... 19

  E.  Arbitration Must be Compelled on an Individual Basis Because Plaintiff Has Waived Her Right to Participate in a Class Action Related to the Agreement.......................................................................... 22

  F.  The Court Should Dismiss This Action Because All of Plaintiff's Claims Are Subject to Arbitration................................................ 24

V.  CONCLUSION ................................................................. 24

Appendix 1: Docket No. 8-1 in *Cronin v. Portfolio Recovery Assocs., LLC*, M.D. Fla. Case No. 8:15-cv-00768-EAK-EAJ (Ex A to Motion to Compel Arbitration - Contract Terms and Conditions).

i

# TABLE OF AUTHORITIES

## Cases

*14 Penn Plaza, LLC v. Pye*, 556 U.S. 247 (2009) ................................................ 10

*Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995) ............................. 10

*Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.)*, 672 F.3d 113 (2d Cir. N.Y. 2011) ................................................................................ 7, 16

*Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231 (2d Cir. 2006).......................... 10

*Ashraf v. Nev. Title & Payday Loans*, Case No. 2:15-cv-1353, 2016 U.S. Dist. LEXIS 25053 (D. Nev. Mar. 1, 2016)........................................................ 20

*AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333 (2011).......................... *passim*

*Bellows v. Midland Credit Management and Midland Funding, LLC,* No. 09-CV-1951, 2011 U.S. Dist. LEXIS 48237 (S.D. Cal. May 4, 2011)...... 15

*Benzemann v. Citibank N.A.*, 12 Civ. 9145 (NRB), 2014 U.S. Dist. LEXIS 88030, 2014 WL 2933140 (S.D.N.Y. June 27, 2014).................................... 12

*Brown v. Sklar-Markind, et. al,* 2014 U.S. Dist. LEXIS 157891 (W.D. Pa. Nov. 7, 2014) ............................................................................................ 15

*Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440 (2006) ..................... 11

*Chiarella v. Vetta Sports*, 94 Civ. 5933 (PKL), 1994 U.S. Dist. LEXIS 14395, 1994 WL 557114 (S.D.N.Y. Oct. 7, 1994)..................................................... 17

*Cho v. JS Autoworld 1 Ltd.*, 97 F. Supp. 3d 351 (E.D.N.Y. 2015) .................... 24

*Collins & Aikman Prods. Co. v. Building Sys.*, 58 F.3d 16 (2d Cir. N.Y. 1995) ................................................................................................. 17, 18

*Credit Acceptance Corp. v. Davisson*, 644 F. Supp. 2d 948 (N.D. Ohio 2009) ................................................................................................. 13, 19

*Cronin v. Portfolio Recovery Assocs., LLC*, No. 8:15-cv-00768-EAK-EAJ, 2016 U.S. Dist. LEXIS 57541 (M.D. Fla. Apr. 29, 2016).......................... 21, 22, 23

*David L. Threlkeld & Co. v. Metallgesellschaft, Ltd.*, 923 F.2d 245 (2d. Cir. 1991) ............................................................................................... 8

*DIRECTV, Inc. v. Imburgia*, __ U.S. __, 136 S.Ct. 463, 193 L.Ed.2d 365 (2015) .................................................................................................... 11

*Dixon v. NBCUniversal Media, LLC,* 947 F. Supp. 2d 390 (S.D.N.Y. 2013) ....... 24

*Donel Corp. v. Kosher Overseers Ass'n of Am.*, No. 92 CIV. 8377 (DLC), 2001 U.S. Dist. LEXIS 2314, 2001 WL 228364 (S.D.N.Y. Mar. 8, 2001) .............. 15

*Fedotov v. Peter T. Roach and Associates, P.C.*, 03 Civ. 8823 (CSH), 2006 U.S. Dist. LEXIS 11422, 2006 WL 692002 (S.D.N.Y. March 17, 2006)................ 12

*Garcia v. Weltman, Weinberg & Reis Co.*, No. 2:13-cv-14362, 2014 U.S. Dist. LEXIS 59825, 2014 WL 1746522 (E.D. Mich. Apr. 30, 2014) .......... 17, 19, 21

*Garrett v. Margolis, Pritzker, Epstein & Blatt, P.A.*, 861 F. Supp. 2d 724 (E.D. Va. 2012) ...................................................................................... 21

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991) ..................... 9, 10

*Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79 (2000) ........................ 8, 14

*Harris v. Green Tree Fin. Corp.*, 183 F.3d 173 (3d Cir. 1999) .......................... 11

*Hilton v. Midland Funding LLC*, Civ. No. 15-10322, 2016 U.S. Dist. LEXIS 43198 (E.D. Mich. Mar. 31, 2016) ............................................................. 20

*Hodson v. Javitch, Block & Rathbone, LLP*, 531 F. Supp. 2d 827 (S.D. Ohio 2008) ...................................................................................................... 21

*Interstate Brands Corp. v. Bakery Drivers, Local Union No. 550*, 167 F.3d 764 (2d Cir. N.Y. 1999) ................................................................................. 18

*Jenkins v. First American Cash Advance of Georgia, Inc.*, 400 F.3d 868 (11th Cir. 2005) ................................................................................................ 11

*Jenkins v. Percival*, 962 P.2d 796 (Utah 1998) .............................................. 14

*Koch v. Compucredit Corp.*, 543 F.3d 460 (8th Cir. 2008) .............................. 20

*Levinson v. Green Tree Servicing, LLC*, 2015 U.S. Dist. LEXIS 54847 (M.D. Fla. Apr. 27, 2015) ......................................................................................... 22

*Lippus v. Dahlgren Mfg. Co.*, 644 F. Supp. 1473 (E.D.N.Y. 1986) ................... 16

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218 (2d Cir. N.Y. 2001). ........................................................................... 17, 18

*McDonnell Douglas Finance Corp. v. Pennsylvania Power and Light Co.*, 858 F.2d 825 (2d Cir. 1988) ........................................................................... 17

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985)... 7

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983).... 10

*Nicosia v. Amazon.com, Inc.*, 84 F. Supp. 3d 142 (E.D.N.Y. 2015) ............. 10, 24

*Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198 (S.D.N.Y. 2000)..... 16

*Oldroyd v. Elmira Sav. Bank, FSB,* 134 F.3d 72 (2d Cir. N.Y. 1998) ............... 18

*Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483 (2d Cir. N.Y. 2013) ................. 10

*Perry v. Thompson*, 482 U.S. 483 (1987) ....................................................... 7

*Porzig v. Dresdner Kleinwort Benson North Am. LLC*, No. 98 Civ. 7670 (BSJ), 1999 U.S. Dist. LEXIS 11067, 1999 WL 518833 (S.D.N.Y. July 21, 1999) ..................................................................................................... 15, 16

*Preston v. Ferrer*, 552 U.S. 346 (2008) .......................................................... 9

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (U.S. 1989) ................................................................................................ 9

*Salim Oleochemicals v. M/V Shropshire*, 278 F.3d 90 (2d Cir. N.Y. 2002)........ 24

*Shetiwy v. Midland Credit Management, Inc.*, 959 F. Supp. 2d 469 (S.D.N.Y. 2013) ......................................................................................... 8, 12

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l*, 198 F.3d 88 (2d Cir. 1999) ............................................................................ 16

*Solvay Pharms. v. Durand Pharms., Inc.*, 442 F.3d 471 (6th Cir. 2006) ...... 18, 19

*Stolt-Nielsen S.A. v. Animal Seeds Int'l. Corp.*, 559 U.S. 662 (2010) ................. 7

*Thomson-CSF v. American Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995) ........ 16

*Vaden v. Discover Bank*, 129 S. Ct. 1262 (2009) .............................................. 9

*Variblend Dual Dispensing Sys., LLC v. Seidel GmbH & Co., KG*, 970 F. Supp. 2d 157 (S.D.N.Y. 2013 ........................................................................... 15

*Volt Info. Scis. v. Bd. of Trustees*, 489 U.S. 468 (1989)...................................... 7

## Statutes

9 U.S.C. § 2 ................................................................................................... 7

15 U.S.C. § 1692e .......................................................................................... 1

15 U.S.C. § 1692e(10) .................................................................................... 1

15 U.S.C. § 1692g(a)(4)................................................................................... 1

Fair Debt Collection Practices Act, 15 U.S.C. § 1692a, *et seq.* ................. *passim*

Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*........................................... *passim*

Utah Code Ann. § 78-31a-3 (1996) ............................................................. 14

Defendants, Midland Funding, LLC ("MF"), Midland Credit Management, Inc. ("MCM") and Encore Capital Group, Inc. ("ECG") (collectively referred to herein as "Midland"), by and through their undersigned counsel, Marshall Dennehey Warner Coleman and Goggin, PC, hereby submit their Memorandum of Law in Support of Defendant's Motion to Compel Arbitration, stating as follows:

## I.  **INTRODUCTION**

In her Class Action Complaint, plaintiff Lea Reich ("Plaintiff") asserts one cause of action, alleging various violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692a, *et. seq.*, on behalf of a putative class based on a December 17, 2014, collection letter (the "Letter"). Specifically, Plaintiff alleges certain language in the Letter violates §§ 1692e, 1692e(10) and 1692g(a)(4) of the FDCPA, because it overshadows the Letter's required debt-validation language such that a consumer would be misled into thinking she could only dispute her debt in writing. The Letter was sent in an effort to collect on Plaintiff's valid, due and delinquent credit card debt, originally owed to GE Capital Retail Bank ("GE Capital")[1] in an amount exceeding $8,007.82, that is now owned by MF. Even if the allegations in the Complaint are true (which Midland denies) and give rise to a valid cause of action under the FDCPA (which Midland also denies), Plaintiff cannot maintain litigation in this forum. Plaintiff is bound by the terms of her cardholder agreement with GE Capital/Synchrony Bank (hereinafter, "Synchrony") to arbitrate any claims

---

[1] GE Capital Retail Bank is now known as Synchrony Bank and was known as Synchrony Bank prior to Plaintiff's default on her subject debt obligation.

1

related to the Account before the American Arbitration Association. Additionally, Plaintiff waived her right to participate in any class action related to the Account, thereby precluding her from serving as class representative in this action. Therefore, the Court should dismiss this action in favor of individual arbitration of Plaintiff's claims.

## II.   **STATEMENT OF FACTS**

Plaintiff opened a Banana Republic store account on or about December 21, 2003. *See* Affidavit of Angel Nayman in Support of Midland's Motion to Compel Arbitration (the "Synchrony Aff."), submitted contemporaneously herewith, at ¶ 5. On or about March 10, 2008, pursuant to Plaintiff's request, her Banana Republic account was upgraded to a Banana Republic-branded GE Money Bank Visa credit card account ending with the four digits, 8020 (the "Account"). Synchrony Aff. at ¶ 6 and Ex. A. In accordance with its standard practice, Synchrony mailed to Plaintiff a copy of the agreement relating to the Account (the "Agreement"), which contains the terms and conditions governing the Account. Synchrony Aff. at ¶ 6. A true and correct copy of the Agreement is attached to the Synchrony Affidavit as Exhibit A thereto. The Agreement was mailed to Plaintiff at the address included on her application – 1871 55th Street, Brooklyn, NY 11204-1907. Synchrony Aff. at ¶ 6. This is the same address to which MCM mailed the Letter at issue in Plaintiff's Complaint. ECF 1 at p. 7. The Agreement expressly provided that the card issuer could, "at any time and for any reason, change, add or delete provisions of this Agreement,

including increasing rates or fees, or terminate [the] Account."  Agreement at p. 9, ¶ 11.

In June 2012, the terms and conditions on the Account changed, and the changed terms and conditions (the "Terms & Conditions") were sent to Plaintiff at her account address.  Synchrony Aff. at ¶ 6.  A true and correct copy of the Terms & Conditions, which remain in effect today, is attached to the Synchrony Affidavit as Exhibit B thereto.  Pursuant to the Terms & Conditions, the "entire Agreement includes the four sections of [the Terms & Conditions], the application [Plaintiff] submitted in connection with the account, and any financial terms of [Plaintiff's] account not otherwise revised by the [new Terms & Conditions]."  Terms & Conditions at Section III.  Thus, the Agreement and the Terms & Conditions are an integrated contract, with the Terms & Conditions governing where inconsistent with the Agreement.

By using her Account, Plaintiff agreed to all terms of the Agreement, which include the Terms & Conditions.  Agreement at p. 3, ¶ 1.  It is evident that Plaintiff used the credit card at issue because her statements and the account records show a balance and payment activity.  Synchrony Aff. at ¶ 8 and Exhibit C; Affidavit of Michael Burger in Support of Midland's Motion to Compel Arbitration (the "MCM Affidavit") at ¶¶ 10-12 and Exhibits 3-5.  From inception, Plaintiff's Account was subject to a broad arbitration clause.  See Agreement at pp. 11-12, ¶ 19.  However, it is the broad arbitration clause in the Terms & Conditions that is relevant to the instant motion, which states in relevant part:

3

## RESOLVING A DISPUTE WITH ARBITRATION

**PLEASE READ THIS SECTION CAREFULLY. IF YOU DO NOT REJECT IT, THIS SECTION WILL APPLY TO YOUR ACCOUNT, AND MOST DISPUTES BETWEEN YOU AND US WILL BE SUBJECT TO INDIVIDUAL ARBITRATION. THIS MEANS THAT: (1) NEITHER A COURT NOR A JURY WILL RESOLVE ANY SUCH DISPUTE; (2) YOU WILL NOT BE ABLE TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING; (3) LESS INFORMATION WILL BE AVAILABLE; AND (4) APPEAL RIGHTS WILL BE LIMITED.**

- What claims are subject to arbitration

1. If either you or we make a demand for arbitration, you and we must arbitrate any dispute or claim between you or any other user of your account, and us, our affiliates, agents and/or The Gap, Inc. if it relates to your account, except as noted below.

2. We will not require you to arbitrate: (1) any individual case in small claims court or your state's equivalent court, so long as it remains an individual case in that court; or (2) a case we file to collect money you owe us. However, if you respond to the collection lawsuit by claiming any wrongdoing, we may require you to arbitrate.

3. Notwithstanding any other language in this section, only a court, not an arbitrator, will decide disputes about the validity, enforceability, coverage or scope of this section or any part thereof (including, without limitation, the next paragraph of this section and/or this sentence). However, any dispute or argument that concerns the validity or enforceability of the Agreement as a whole is for the arbitrator, not a court, to decide.

- **No Class Actions**

**YOU AGREE NOT TO PARTICIPATE IN A CLASS, REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL ACTION AGAINST US IN COURT OR ARBITRATION. ALSO, YOU MAY NOT BRING CLAIMS AGAINST US ON BEHALF OF ANY ACCOUNTHOLDER WHO IS NOT AN ACCOUNTHOLDER ON YOUR ACCOUNT, AND YOU AGREE THAT ONLY ACCOUNTHOLDERS ON YOUR ACCOUNT MAY BE JOINED IN A SINGLE ARBITRATION WITH ANY CLAIM YOU HAVE.**

\*   \*   \*

- **Governing Law for Arbitration**

4

This Arbitration section of your Agreement is governed by the Federal Arbitration Act (FAA). Utah law shall apply to the extent state law is relevant under the FAA. The arbitrator's decision will be final and binding, except for any appeal right under the FAA. Any court with jurisdiction may enter judgment upon the arbitrator's award.

- **How to reject this section**

  **You may reject this Arbitration section of your Agreement. If you do that, only a court may be used to resolve any dispute or claim. To reject this section, you must send us a notice within 60 days after you open your account or we first provided you with your right to reject this section. The notice must include your name, address and account number, and must be mailed to Synchrony Bank, P.O. Box 965012, Orlando, FL 32896-5012. This is the only way you can reject this section.**

*See*, Terms & Conditions at p. 5 (emphasis original). The Terms & Conditions also include the following third-party beneficiary provision:

> **Assignment.**   We may sell, assign or transfer any or all of our rights or duties under this Agreement or your account, including our rights to payments. We do not have to give you prior notice of such action.

*Id.* at p. 4. As indicated above, the Terms & Conditions provide an opportunity to reject the arbitration provisions therein by written notice within 60 days of opening the account or after first notification of the right to reject.  *See* Terms & Conditions at p. 5.   According to Synchrony's records, Plaintiff never submitted a notice rejecting the arbitration provisions of the Terms & Conditions.  Synchrony Aff. at ¶ 7.

Synchrony's records indicate Plaintiff made her last payment on the Account on July 4, 2013, and the Account was charged off on January 26, 2014.  Synchrony Aff. at ¶¶ 8-9.   Thereafter, on or about November 26, 2014,

Synchrony sold a portfolio of defaulted accounts, including Plaintiff's Account, to MF. Synchrony Aff. at ¶ 10; MCM Aff. at ¶ 6.  As the purchaser of Plaintiff's defaulted Account with Synchrony, and as assignee of all rights previously held by Synchrony under the Agreement and the Terms & Conditions, MF has the right to enforce Synchrony's arbitration agreement, including compelling arbitration of any dispute related to Plaintiff's Account.  MCM, a corporate relative of MF, and ECG, the parent company of MF and MCM, have the right to enforce the arbitration agreement under its broad description of the parties entitled to do so. *See* MCM Aff. at ¶ 4.  Therefore, Defendants respectfully request that this Honorable Court dismiss this action in favor of individual arbitration of Plaintiff's claims as set forth in her Complaint.

## III.   PROCEDURAL HISTORY

On December 17, 2015, Plaintiff filed the Complaint against MF, MCM and ECG in this Court, alleging statutory violations of the FDCPA.  Specifically, Plaintiff claims that certain language in the Letter would lead a reasonable least sophisticated consumer to believe all disputes must be in writing, which is contrary to the dictates of the FDCPA.[2] ECF 1 at ¶¶ 15-17.  On February 17, 2016, Defendants filed their Answer, denying each claim asserted by Plaintiff and positing numerous affirmative defenses to Plaintiff's claims.  ECF 10. Defendants particularly plead their right to compel arbitration as an affirmative defense. *Id.* at pp. 15-16 (Sixteenth Affirmative Defense).

---

[2] While not germane to this Motion, MF and Encore did not issue any letters to plaintiff, the subject letter was drafted, prepared, approved, and issued by MCM.

## IV.   ARGUMENT

### A.   THE FEDERAL ARBITRATION ACT REQUIRES ENFORCEMENT OF VALID ARBITRATION AGREEMENTS.

#### 1.   *Requirements for Arbitrability Under the Federal Arbitration Act.*

The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (the "FAA" or the "Act"), provides that a written arbitration provision contained in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The FAA creates a body of federal substantive law of arbitrability, which is applicable to arbitration agreements and contracts that involve interstate commerce. *Perry v. Thompson*, 482 U.S. 483, 489 (1987). The United States Supreme Court has repeatedly held that the "'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (quoting *Volt Info. Scis. v. Bd. of Trustees*, 489 U.S. 468, 478 (1989)); see also *Stolt-Nielsen S.A. v. Animal Seeds Int'l. Corp.*, 559 U.S. 662, 681-682 (2010).

Under the FAA, provided a contract evidences a transaction involving commerce, the Court must compel arbitration if it finds: (1) that a valid arbitration agreement exists between the parties; and (2) that the dispute before it falls within the scope of the agreement. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-28 (1985); *Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.),* 672 F.3d 113, 128 (2d Cir. N.Y. 2011)

("In this Circuit, courts follow a two-part test to determine the arbitrability of claims [asking:] (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the Arbitration Agreement.")  The Act requires the Court to engage in a limited review to confirm that the dispute is arbitrable – *i.e.*, that a valid agreement to arbitrate exists between the parties and that this specific dispute falls within the substantive scope of the agreement. Where the court concludes that an agreement exists and the dispute falls within the scope of that agreement, it must refer the matter to arbitration without considering the merits of the claims. *David L. Threlkeld & Co. v. Metallgesellschaft, Ltd.*, 923 F.2d 245 (2d. Cir. 1991).

### 2. *Plaintiff Bears the Burden of Proving Her Claims are Not Arbitrable.*

Under the FAA, "[t]he party resisting arbitration bears the burden of demonstrating that the arbitration agreement is invalid or does not encompass the claims at issue." *Shetiwy v. Midland Credit Management, Inc.*, 959 F. Supp. 2d 469, 473 (S.D.N.Y. 2013) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000) ("*Green Tree*")).  This burden remains the same even if the substantive law attending the plaintiff's claims implicates strong public policy concerns. *Green Tree*, 531 U.S. at 89-90.  As the Court stated in *Green Tree*:

> We have likewise rejected generalized attacks on arbitration that rest on "suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants."  . . .  These cases demonstrate that even claims arising under a statute designed to further important social policies may be arbitrated . . .

*Id.* (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 481 (U.S. 1989)). Thus, courts have construed numerous claims based on federal statutes to be arbitrable because no party forgoes any rights under the applicable statute, they merely have those rights adjudicated in the alternate forum of arbitration. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) ("*Gilmer*").

In the instant matter, Plaintiff cannot meet her burden of proving the non-arbitrability of her statutory claims. As set forth below at part IV.C, the arbitration provision at issue is valid and enforceable because the Terms & Conditions were expressly incorporated into Plaintiff's contract with Synchrony, were agreed to by Plaintiff, and the arbitration clause is valid under applicable state law. Also, as set forth at Part IV.D, Plaintiff's claims fall squarely within the scope of the arbitration provision because they are based solely on conduct – collection of her contractual debt – arising under the Agreement. Therefore, Plaintiff will be unable to meet her burden of proving the arbitration provision is invalid or that her FDCPA claims are beyond its scope.

### 3. *The FAA Provides a Strong Presumption in Favor of Arbitration.*

The FAA "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). Thus, federal law requires that courts rigorously enforce arbitration agreements. *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 345 (2011) ("[O]ur cases place it beyond dispute that the FAA was designed to promote arbitration."); see also *Vaden v. Discover Bank*, 129 S. Ct. 1262, 1271

(2009); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 486 (2d Cir. N.Y. 2013). In fact, Congress enacted the FAA to "reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer*, 500 U.S. at 24. As the Supreme Court has stated:

> [T]he recognition that arbitration procedures are more streamlined than federal litigation is not a basis for finding the forum somehow inadequate; the relative informality of arbitration is one of the chief reasons that parties select arbitration. Parties 'trad[e] the procedures and opportunity for review of the courtroom for the simplicity, informality and expedition of arbitration.'

*14 Penn Plaza, LLC v. Pye*, 556 U.S. 247, 269 (2009) (citations omitted); accord *AT&T Mobility*, 563 U.S. at 344 ("The point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures . . . [T]he informality of arbitration proceedings is itself desirable, reducing the cost and increasing the speed of dispute resolution"). Thus, "the Second Circuit has noted that 'it is difficult to overstate the strong federal policy in favor of arbitration,' and has observed that it is a policy that the Court has 'often and emphatically applied.'" *Nicosia v. Amazon.com, Inc.*, 84 F.Supp. 3d 142, 150 (E.D.N.Y. 2015) (quoting *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006)).

The Supreme Court has favored arbitration as a preferred method of dispute resolution in the context of consumer disputes. For example, in *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 280 (1995), the Court stated:

> We agree that Congress, **when enacting [the FAA], had the needs of consumers, as well as others, in mind** . . . [T]he Act, by avoiding the 'delay and expense of litigation,' will appeal 'to big business and little businesses alike, . . . corporate interests [and] ... individuals.' Indeed, arbitration's advantages often would seem helpful to individuals, say, complaining about a product, who need a less expensive alternative to litigation.

(emphasis added) (internal citations omitted); see also *DIRECTV, Inc. v. Imburgia*, __ U.S. __, 136 S.Ct. 463, 193 L.Ed.2d 365 (2015). A 2009 study of FAA consumer arbitrations, undertaken by Northwestern University's School of Law, concluded that arbitration was both an economical and expeditious way for consumers to resolve disputes with businesses. See *Searle Civil Justice Institute, Consumer Arbitration Before the American Arbitration Association* (2009), http://masonlec.org/programs/83 (last visited June 1, 2016).

In accordance with the strong federal policy in favor of arbitration, courts have repeatedly declined to invalidate arbitration agreements, even where there is an apparent disparity in the parties' bargaining power. *See, AT&T Mobility*, 563 U.S. 333 (2011) (enforcing arbitration clause in cellular phone contract with consumer); *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440 (2006) (enforcing arbitration clause in alleged usurious pay-day loan agreement); *Jenkins v. First American Cash Advance of Georgia, Inc.*, 400 F.3d 868 (11th Cir. 2005), *cert. denied*, 546 U.S. 1214 (2006); *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173 (3d Cir. 1999); *see also Green Tree Fin. Corp-Ala. v. Randolph*, 531 U.S. 79 (2000). In *AT&T Mobility*, the Supreme Court rejected the notion that an arbitration agreement was unconscionable as an adhesion contract, stating "the times in which consumer contracts were anything other than

11

adhesive are long past." *AT&T Mobility*, 563 U.S. at 346-347. The Court further declined to invalidate the arbitration agreement at issue due to its inclusion of a class action waiver, finding that "requiring the availability of class wide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Id.* at 344.

The federal courts of New York have also properly compelled individual arbitration in consumer disputes. *See, e.g., Shetiwy v. Midland Credit Management, Inc.*, 959 F. Supp. 2d 469 (S.D.N.Y. 2013); *Fedotov v. Peter T. Roach and Associates, P.C.*, 03 Civ. 8823 (CSH), 2006 U.S. Dist. LEXIS 11422, 2006 WL 692002 (S.D.N.Y. March 17, 2006); *Benzemann v. Citibank N.A.*, 12 Civ. 9145 (NRB), 2014 U.S. Dist. LEXIS 88030, 2014 WL 2933140 (S.D.N.Y. June 27, 2014), *rev'd on other grounds*, 806 F.3d 98 (2d Cir. 2015). This matter must be dismissed in favor of arbitration as well.

## B. THE TERMS & CONDITIONS ARE A CONTRACT EVIDENCING TRANSACTIONS IN INTERSTATE COMMERCE.

The transactions at issue in this case "involve commerce" within the meaning of the FAA. The Agreement, which contains the above-quoted arbitration language, was entered into for commercial purposes, *i.e.*, for Synchrony to advance credit to Plaintiff for purchases made with her credit card. Also, executing the Agreement was an act of interstate commerce. Plaintiff is a resident of New York. ECF 1 at ¶ 2. As stated in the Terms & Conditions, Synchrony is a resident of Utah. Terms & Conditions at p. 3; Synchrony Aff, at ¶ 2. Also as stated in the Terms & Conditions, "[t]his Agreement has been accepted by [Synchrony] in Utah." *Id.* at p. 4. MF, the

current owner of Plaintiff's Account debt, and MCM, the servicer of Plaintiff's Account debt, are wholly-owned subsidiaries of ECG, with a principal places of business in San Diego, California.  ECF 2 at ¶ 7.  Encore also has its principal place of business in San Diego, California.  *Id.*  Thus, all transactions between the parties, including those between Plaintiff and Synchrony, necessarily flowed through interstate commerce.  *See, e.g., Anderson v. Delta Funding Corp.*, 316 F. Supp. 2d 554, 561 (N.D. Ohio 2004) ("[L]oan transactions historically have been evaluated under the FAA because of the banking industry's connection to commerce").

The Terms & Conditions themselves acknowledge the applicability of the FAA to the arbitration provisions of the parties' Agreement.  They state:

> The Arbitration section of your Agreement is governed by the [FAA]. Utah law shall apply to the extent state law is relevant under the FAA.  The arbitrator's decision will be final and binding, except for any appeal right under the FAA.

*See* Terms & Conditions at p. 5.  This language is compelling evidence that the FAA's interstate commerce requirement has been satisfied with respect to the parties' Agreement.  See*, e.g., Credit Acceptance Corp. v. Davisson*, 644 F. Supp. 2d 948, 954 (N.D. Ohio 2009) (finding the FAA applied because "the Contract itself provides that '[t]he Federal Arbitration Act governs this Arbitration Clause'").

**C.   THE AGREEMENT AT ISSUE CONTAINS VALID AND ENFORCEABLE ARBITRATION PROVISIONS.**

*1.   The Parties had an Agreement to Arbitrate.*

As noted above, to avoid dismissal of this action in favor of arbitration, Plaintiff bears the burden of proving that the arbitration agreement contained in the Terms & Conditions is in some way invalid. *Green Tree Fin. Corp*, 531 U.S. at 92. Plaintiff cannot meet this burden because the Terms & Conditions are indisputably part of the contract that is applicable to Plaintiff's Account. Synchrony Aff. at ¶ 6. As detailed in the Synchrony Affidavit, Plaintiff received a written copy of the Agreement with her credit card. Synchrony Aff. at ¶ 6. In June of 2012, the Agreement was amended by the Terms & Conditions, to which Plaintiff was bound under the original Agreement. The Terms & Conditions provide clear instructions regarding opting out of the arbitration provisions. Terms & Conditions at p. 5. She did not opt out of the arbitration provisions, thereby agreeing to their terms. Synchrony Aff. at ¶ 7.

Additionally, the arbitration terms are valid and enforceable. Plaintiff and Synchrony agreed that their contract and Plaintiff's account would be governed by the laws of Utah. Terms & Conditions at p. 4. Under Utah law, arbitration agreements are valid, enforceable, and irrevocable, if reduced to a writing. *Jenkins v. Percival*, 962 P.2d 796, 799 (Utah 1998) (citing Utah Code Ann. § 78-31a-3 (1996)). Thus, the arbitration provisions contained in the Agreement, which was supported by consideration on both sides, are fully enforceable because they are contained in the written Terms & Conditions to which Plaintiff and Synchrony agreed.

14

### 2. *Midland, as Successor to all Rights Relating to Plaintiff's Account, May Enforce the Arbitration Agreement Contained in the Terms & Conditions.*

All rights under the Agreement inure to the benefit of Midland as the current owner of Plaintiff's Account debt and as assignee of Synchrony's rights under the Terms & Conditions. Midland stands in the shoes of Synchrony with respect to the Agreement. See *Variblend Dual Dispensing Sys., LLC v. Seidel GmbH & Co., KG*, 970 F. Supp. 2d 157 (S.D.N.Y. 2013); *Bellows v. Midland Credit Management and Midland Funding, LLC*, No. 09-CV-1951, 2011 U.S. Dist. LEXIS 48237 (S.D. Cal. May 4, 2011); *Brown v. Sklar-Markind, et. al,* 2014 U.S. Dist. LEXIS 157891 (W.D. Pa. Nov. 7, 2014). Also, as noted above, the Terms & Conditions provided Synchrony the right to assign all of its rights under the Agreement, specifically stating, "[w]e may sell, assign or transfer any or all of our rights or duties under this Agreement to a third party." Terms & Conditions at p. 4. Therefore, Defendants can compel Plaintiff to seek arbitration on an individual basis to the same extent Synchrony could have with respect to any dispute related to the Account.

It is axiomatic that, as long as an arbitration agreement is itself valid, an assignee of, and legal successor to, the agreement has the right to arbitrate any dispute related to the contract with the other party to the agreement. *Donel Corp. v. Kosher Overseers Ass'n of Am.*, No. 92 CIV. 8377 (DLC), 2001 U.S. Dist. LEXIS 2314, *8-9, 2001 WL 228364 (S.D.N.Y. Mar. 8, 2001). In fact, "[t]he law is clear that an arbitration agreement may be enforced both by and against the successors-in-interest of the original signatories." *Porzig v. Dresdner Kleinwort*

*Benson North Am. LLC*, No. 98 Civ. 7670 (BSJ), 1999 U.S. Dist. LEXIS 11067, *16 n.5, 1999 WL 518833, at *5 n.5 (S.D.N.Y. July 21, 1999); see also, *Lippus v. Dahlgren Mfg. Co.*, 644 F. Supp. 1473, 1482 (E.D.N.Y. 1986) (finding that successor in interest to a party to an arbitration agreement could enforce the arbitration clause).    In fact, the Second Circuit,  and other circuits, "have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l*, 198 F.3d 88, 98 (2d Cir. 1999) (quoting *Thomson-CSF v. American Arbitration Ass'n*, 64 F.3d 773, 778-779 (2d Cir. 1995)); see also *Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 203 (S.D.N.Y. 2000). Therefore, Midland has every right Synchrony had to require that any disputes relating to the Agreement be brought pursuant to the arbitration provisions of the Terms & Conditions.

**D.    PLAINTIFF'S CLAIMS AGAINST DEFENDANTS FALL WITHIN THE BROAD SCOPE OF THE ARBITRATION PROVISIONS OF THE TERMS & CONDITIONS.**

Midland has shown that the Agreement contains valid and enforceable arbitration terms.    It has also shown that it has full rights under the Agreement to enforce those terms, thereby moving the analysis to the second prong of the Second Circuit's two-part inquiry regarding compelling arbitration: whether Plaintiff's claims against Defendants fall within the scope of the arbitration agreement.    *Anderson v. Beland (In re. Am. Express Fin. Advisors. Sec. Litig.)*, 672 F.3d 113, 128 (2d. Cir. 2011).   Viewing the claims Plaintiff

asserts in her Complaint in light of the broad scope of the arbitration agreement set forth in the Terms & Conditions, it is obvious Plaintiff's claims are subject to arbitration.

### 1. The Arbitration Provisions of the Terms & Conditions are Broad in Scope.

To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court should first classify the particular clause as either broad or narrow. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 224 (2d Cir. N.Y. 2001). Broad clauses "purport to refer to arbitration all disputes arising out of a contract, while narrow clauses limit arbitration to a specific type of dispute." *Chiarella v. Vetta Sports*, 94 Civ. 5933 (PKL), 1994 U.S. Dist. LEXIS 14395, *11, 1994 WL 557114 (S.D.N.Y. Oct. 7, 1994) (citing *McDonnell Douglas Finance Corp. v. Pennsylvania Power and Light Co.,* 858 F.2d 825, 832 (2d Cir. 1988)). "Where the arbitration clause is broad, only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration, will remove the dispute from consideration by the arbitrators." *Garcia v. Weltman, Weinberg & Reis Co.*, No. 2:13-cv-14362, 2014 U.S. Dist. LEXIS 59825, *9, 2014 WL 1746522 (E.D. Mich. Apr. 30, 2014).

In the matter *sub judice,* the arbitration agreement has a "broad scope" as the term has been used by courts in the context of arbitration agreements. See, e.g., *Louis Dreyfus Negoce S.A.*, 252 F.3d at 225 ("any dispute arising from the making, performance or termination of this [contract]" found to be broad in scope); *Collins & Aikman Prods. Co. v. Building Sys.,* 58 F.3d 16, 18 (2d Cir.

N.Y. 1995) (provision stating, "[a]ny claim or controversy arising out of or relating to this agreement shall be settled by arbitration. . ." held to be a broad clause).  The arbitration language simply states that, except with respect to a few exclusions inapplicable herein, arbitration is required for "**any dispute or claim** between you or any other user of your account, and us, our affiliates, agents and or the Gap, Inc. **if it relates to your account** . . ." Terms & Conditions at p. 5 (emphasis added).  As in *Louis Dreyfus* and *Collins & Aikman*, the arbitration provisions in the Terms & Conditions, as agreed to by Plaintiff and Synchrony, covers "any dispute" that relates to the Agreement in any way.  Accordingly, the arbitration agreement at issue is a broad clause.

### 2. *The Presumption in Favor of Arbitrability is Heightened Where the Arbitration Agreement in Question has a Broad Scope.*

The presumption in favor of arbitrability "is particularly applicable . . . when the arbitration clause is broad." *Interstate Brands Corp. v. Bakery Drivers, Local Union No. 550*, 167 F.3d 764, 767 (2d Cir. N.Y. 1999); *see also Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72 (2d Cir. N.Y. 1998); *Solvay Pharms. v. Durand Pharms., Inc.,* 442 F.3d 471 (6th Cir. 2006).  As the U.S. Court of Appeals for the Sixth Circuit explained:

> [w]hen faced with a broad arbitration clause, such as one covering **any** dispute arising out of an agreement, a court should follow the presumption of arbitration and resolve doubts in favor of arbitration . . . Indeed, in such a case, only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration, will remove the dispute from consideration by arbitrators.

18

*Solvay Pharms.,* 442 F.3d at 482, n. 10) (emphasis in the original); accord *Credit Acceptance Corp. v. Davisson,* 644 F. Supp. 2d 948, 959 (N.D. Ohio 2009); *Garcia v. Weltman, Weinberg & Reis Co.,* No. 2:13-cv-14362, 2014 U.S. Dist. LEXIS 59825, *9, 2014 WL 1746522 (E.D. Mich. Apr. 30, 2014). Accordingly, the Court must provide all deference to Defendants with respect to their request to compel arbitration.

### 3. *Plaintiff's FDCPA Claims Fall Within the Broad Scope of the Arbitration Provisions of the Terms & Conditions.*

Plaintiff alleges MCM's attempts to collect upon her valid and delinquent debt account violated the FDCPA. ECF 1 at ¶¶ 20-28. Plaintiff bases all of her claims on the same conduct. *Id.* Plaintiff's claims "relate to [her] account" because they arise out of attempts to collect on the account. The Agreement refers "any claim" that is "related to" the Account to arbitration. Terms & Conditions at p. 5. Accordingly, Plaintiff's FDCPA claims fall within the broad scope of the arbitration clause of the Terms & Conditions, requiring that they be arbitrated. As established above, that requirement extends to MF as assignee of the Account.

Courts have consistently recognized that an FDCPA claim "relates to" the agreement giving rise to the debt sought to be collected, such that the claims fall within the scope of a broad arbitration provision in the agreement. See, e.g., *Garcia v. Weltman, Weinberg & Reis Co.,* No. 2:13-cv-14362, 2014 U.S. Dist. LEXIS 59825, *8-9, 2014 WL 1746522 (E.D. Mich. Apr. 30, 2014) (holding FDCPA claims subject to arbitration clause in retail sales installment contract). In *Garcia,* the court found the plaintiff's FDCPA claims fell within the scope of

19

an arbitration provision that encompassed "any dispute, controversy or claim

. . . arising out of or in any way related to the Agreement." *Id.* The operative

terms of the arbitration agreement in *Garcia* are substantially the same as the

arbitration terms in the Terms & Conditions. See, also *Hilton v. Midland*

*Funding LLC*, Civ. No. 15-10322, 2016 U.S. Dist. LEXIS 43198 (E.D. Mich. Mar.

31, 2016) (holding FDCPA claims subject to credit agreement's broad

arbitration clause because such claims were not specifically excluded); accord

*Ashraf v. Nev. Title & Payday Loans*, Case No. 2:15-cv-1353, 2016 U.S. Dist.

LEXIS 25053 (D. Nev. Mar. 1, 2016).

The Eighth Circuit Court of Appeals noted the close relationship between

a debt agreement, a collection action relating to a debt arising under that

agreement, and a claim regarding purported violations of the FDCPA with

respect to such collection actions. *Koch v. Compucredit Corp.*, 543 F.3d 460,

466-467 (8th Cir. 2008). The court in *Koch* found:

> The arbitration clause here is broad, covering "any claim, dispute,
> or controversy arising from or related to either this Agreement or
> the relationships that result from this Agreement." A dispute over
> the collection of a debt incurred under the credit agreement is a
> "controversy arising from or related to . . . this Agreement," so
> Koch's claim "would have been subject to [arbitration] had it arisen
> during the contract's term." . . . Nothing in the arbitration clause
> excludes from its operation a dispute which arises under the
> contract, but which is based at least in part on events that occur
> after its termination. Thus, the arbitration provision applies to the
> dispute [at issue].

*Id.* Accordingly, the court remanded the case, directing the lower court to

grant the defendants' motion to compel arbitration of the plaintiff's FDCPA (and

other) claims.

The arbitration provision in the Terms & Conditions contains language as all-encompassing as that at issue in the above-referenced cases. These cases teach that FDCPA claims fall under the umbrella of "any claims," as the phrase is used in arbitration agreements, and are subject to arbitration just like any other claims related to a contract. In fact, courts have specifically held that Congress did not intend FDCPA claims to be non-arbitrable. *Garcia*, 2014 U.S. Dist. LEXIS 59825 at *11; *Garrett v. Margolis, Pritzker, Epstein & Blatt, P.A.*, 861 F. Supp. 2d 724 (E.D. Va. 2012) ("[T]here is no reason to believe . . . that Congress meant to preclude arbitration in the circumstances of the case [involving a FDCPA claim]"); *Hodson v. Javitch, Block & Rathbone, LLP*, 531 F. Supp. 2d 827, 831 (S.D. Ohio 2008) ("Congress did not intend FDCPA claims to be non-arbitrable. Courts routinely permit arbitration of such claims.").

In a case involving the exact same Synchrony arbitration and class action waiver language as is at issue herein, the United States District Court for the Middle District of Florida found the plaintiff's FDCPA claims fell within the scope of the arbitration and class waiver language, requiring the court to dismiss the plaintiff's claims in favor of arbitration.[3] *Cronin v. Portfolio Recovery Assocs., LLC*, No. 8:15-cv-00768-EAK-EAJ, 2016 U.S. Dist. LEXIS 57541, *9 (M.D. Fla. Apr. 29, 2016) ("*Cronin*"). In *Cronin*, the court held the Synchrony arbitration provision was broad, and, thus, encompassed the plaintiff's claims, stating:

---

[3] The Court may take judicial notice of the contract terms and conditions at issue in the *Cronin* case, which were filed with the court as an exhibit to the defendant's motion to compel arbitration therein (M.D. Fla. Case No. 8:15-cv-00768-EAK-EAJ at Docket No. 8-1). A copy is attached hereto as Appendix 1 for the Court's convenience.

> Plaintiff alleges that PRA violated the FDCPA in its attempts to collect his debt. As in *Levinson*, the Court here rules that PRA's allegedly improper attempt to collect Plaintiff's debt relates to Plaintiff's account and falls within the scope of the Arbitration Agreement.

*Id.* (citing *Levinson v. Green Tree Servicing, LLC*, 2015 U.S. Dist. LEXIS 54847 (M.D. Fla. Apr. 27, 2015)).  The court also found the class action waiver in the Synchrony Terms & Conditions was enforceable against the plaintiff.  *Id.* at *8.

The instant matter is identical to the facts in *Cronin*.  The parties executed a broad arbitration clause intended to cover "any dispute or claim." At issue is an "allegedly improper attempt to collect Plaintiff's debt" arising under the agreement containing the arbitration agreements.  Thus, as in Cronin, Plaintiff's FDCPA claims fall within the broad scope of the arbitration provisions in the Terms & Conditions and must be dismissed in favor of arbitration.

**E.    ARBITRATION MUST BE COMPELLED ON AN INDIVIDUAL BASIS BECAUSE PLAINTIFF HAS WAIVED HER RIGHT TO PARTICIPATE IN A CLASS ACTION RELATED TO THE AGREEMENT.**

Plaintiff has affirmatively waived her right to proceed in this forum or at arbitration as a class representative or class member.  Plaintiff agreed that by using her account she would be bound by the terms of the Agreement. Agreement p. 3.  One term of the Agreement bars Plaintiff from participating in any class action litigation related to the Agreement, stating:

**YOU AGREE NOT TO PARTICIPATE IN A CLASS, REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL ACTION AGAINST US IN COURT OR ARBITRATION.  ALSO, YOU MAY NOT BRING CLAIMS AGAINST US ON BEHALF OF ANY ACCOUNTHOLDER WHO IS NOT AN ACCOUNTHOLDER ON**

22

**YOUR ACCOUNT, AND YOU AGREE THAT ONLY ACCOUNTHOLDERS ON YOUR ACCOUNT MAY BE JOINED IN A SINGLE ARBITRATION WITH ANY CLAIM YOU HAVE.**

(emphasis in the original). Terms & Conditions at p. 5. Plaintiff did not exercise her right to opt out of the class action waiver. Synchrony Aff. at ¶ 7. Thus, Plaintiff has waived her right to maintain this (or any other) case on a class action basis. *Cronin*, 2016 U.S. Dist. LEXIS 57541 at *8 (enforcing class action waiver based upon the same Synchrony class waiver language).

Arbitration should be compelled on an individual, non-class basis in accordance with the express terms of the arbitration provisions contained in the Terms & Conditions. As noted by the U.S. Supreme Court, "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *AT&T Mobility*, 563 U.S. at 344. Upholding the class action waiver makes sense in light of this aspect of the arbitration process. Plaintiff *must* go to arbitration, if she wants to pursue her claims. Plaintiff *cannot* institute a class action arbitration per the Terms & Conditions and the FAA as interpreted by the Supreme Court. Thus, upholding the class action waiver is not only consistent with the Agreement, it is consistent with the limitations inherent in the arbitration process.

The Terms & Conditions state that Plaintiff's agreement with Synchrony is governed by the Federal Arbitration Act. Terms & Conditions at p. 5. The FAA pre-empts *any* state law, including common law, that interferes with the strong federal policy in favor of arbitration. *AT&T Mobility*, 563 U.S. at 343. As

23

the Supreme Court noted, while the FAA's "saving clause preserves generally applicable contract defenses, it does not suggest an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* at 334. Accordingly, there is no basis Plaintiff can enunciate to avoid the mandate of the FAA. Plaintiff's only avenue to prosecute her claims is in arbitration as set forth in the Terms & Conditions, requiring that the Court dismiss this action in favor of individual arbitration.

### F. THE COURT SHOULD DISMISS THIS ACTION BECAUSE ALL OF PLAINTIFF'S CLAIMS ARE SUBJECT TO ARBITRATION.

Plaintiff posits one cause of action in her complaint, alleging several violations of the FDCPA. As set forth above, all of her claims are subject to arbitration. Where all of the issues raised in a complaint must be submitted to arbitration, the court may dismiss an action rather than stay proceedings. *Cho v. JS Autoworld 1 Ltd.*, 97 F. Supp. 3d 351, 358 (E.D.N.Y. 2015) (collecting cases); *Dixon v. NBCUniversal Media, LLC,* 947 F. Supp. 2d 390, 392 (S.D.N.Y. 2013); see also, *Salim Oleochemicals v. M/V Shropshire*, 278 F.3d 90 (2d Cir. N.Y. 2002); *Nicosia v. Amazon.com, Inc.*, 84 F. Supp. 3d 142 (E.D.N.Y. 2015). Defendants assert dismissal of this action is warranted because no issues will remain for the Court's consideration after Plaintiff's claims are arbitrated.

### V.   CONCLUSION

For the foregoing reasons, Defendants, Midland Credit Management, Inc., Midland Funding, LLC and Encore Capital Group, Inc., respectfully request the Court grant their Motion to Compel Individual Arbitration, dismissing this action in favor of individual arbitration

24

New York, New York
Dated: June 10, 2016

Respectfully submitted,

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN, P.C.

By:    _____

Joseph A. Hess (JH 1964)
Attorneys for Defendants
Midland Credit Management, Inc.,
Midland Funding, LLC and
Encore Capital Group, Inc.
88 Pine Street, 21st Floor
New York, New York 10005
(212) 376-6438
JAHess@mdwcg.com


TO:    Adam J. Fishbein, Esquire
       Adam J. Fishbein, P.C.
       483 Chestnut Street
       Cedarhurst, NY 11516
       (516) 791-4400
       fishbeinadamj@gmail.com

25

# Appendix 1

**LOWE'S**
**[3945J]**
(03/12)_T&C-PLCC (REV 10/12)

**SYNCHRONY BANK**

**SECTION I: RATES AND FEES TABLE**
**LOWE'S CREDIT CARD ACCOUNT AGREEMENT**
Information from Section I of the Lowe's Credit Card Account Agreement is provided in the accompanying Pricing Information Addendum.

**SECTION II: RATES, FEES AND PAYMENT INFORMATION**
**LOWE'S CREDIT CARD ACCOUNT AGREEMENT**

| How Interest is Calculated | |
|---|---|
| **Your Interest Rate** | We use a daily rate to calculate the interest on the balance on your account each day. The daily rate is the applicable APR times 1/365. Interest will be imposed in amounts or at rates not in excess of those permitted by applicable law. See the accompanying Pricing Information Addendum for information for your specific APR. |
| **When We Charge Interest** | We charge interest on your purchases from the date you make the purchase until you pay the purchase in full. See exceptions below.<br>• We will not charge you interest during a billing cycle on any purchases if:<br> 1. You had no balance at the start of the billing cycle; OR<br> 2. You had a balance at the start of the billing cycle and you paid that balance in full by the due date in that billing cycle.<br>• We will credit, as of the start of the billing cycle, any payment you make by the due date that we allocate to purchases if:<br> 1. You had no balance at the start of the previous billing cycle; OR<br> 2. You had a balance at the start of the previous billing cycle and you paid that balance in full by the due date in the previous billing cycle. |
| **How We Calculate Interest** | We figure the interest charge on your account separately for each balance type. We do this by applying the daily rate to the daily balance for each day in the billing cycle. A separate daily balance is calculated for the following balance types, as applicable: purchases and balances subject to different interest rates, plans or special promotions. See below for how this works.<br> 1. How to get the daily balance. We take the starting balance each day, add any new charges and fees, and subtract any payments or credits. Credit insurance premiums and debt cancellation fees, if any, are not included in the daily balance. This gives us the daily balance. Late payment fees are treated as new purchases;<br> 2. How to get the daily interest amount. We multiply each daily balance by the daily rate that applies.<br> 3. How to get the starting balance for the next day. We add the daily interest amount in step 2 to the daily balance from step 1.<br> 4. How to get the interest charge for the billing cycle. We add all the daily interest amounts that were charged during the billing cycle.<br>We charge a minimum interest charge in any billing cycle in which you owe interest. This charge is added proportionately to each balance type. See the accompanying Pricing Information Addendum for the amount of your minimum interest charge. |

| How Fees Work | |
|---|---|
| **Late Payment Fee** | We will charge this fee if we do not receive the total minimum payment due on your account by 5 p.m. (ET) on the due date. See the accompanying Pricing Information Addendum for the amount of the fee. |

**Minimum Payment Calculation**
See the accompanying Variable Terms Addendum for how the total minimum payment is calculated.



1

**Special Promotional Financing Offer Information**
At times, we may offer you special financing promotions for certain transactions ("special promotions"). The terms of this Agreement apply to any special promotion. However, any special promotional terms that are different than the terms in this Agreement will be explained on promotional advertising. Below is a description of certain special promotions that may be offered:

| | |
|---|---|
| • No Interest if Paid in Full Within 6 Months | For each promotion, if the promotional purchase is not paid in full within the promotional period, interest will be imposed from the date of purchase at the APR that applies to your account when the promotional purchase is made. |
| • No Interest if Paid in Full Within 12 Months | |
| • No Interest if Paid in Full Within 18 Months | This APR will vary with the market based on the prime rate. See the accompanying Pricing Information Addendum for your purchase APR. |
| • No Interest if Paid in Full Within 24 Months | |

When you make a qualifying purchase under one of the promotions shown immediately above, no interest will be assessed on the purchase if you pay the promotional purchase in full within the applicable promotional period. If you do not, interest will be assessed on the promotional purchase from the date of the purchase. Minimum monthly payments are required.

OR

| | |
|---|---|
| • No Interest for 24 Months | For each promotion, after the promotion ends, the APR that applies to your account when the promotional purchase is made will apply. |
| • No Interest for 36 Months | This APR will vary with the market based on the prime rate. See the accompanying Pricing Information Addendum for your purchase APR. |

When you make a qualifying purchase under one of the promotions shown immediately above, no interest will be assessed on the purchase during the promotional period and a unique monthly payment will be required equal to at least 4.1697% of your initial promo purchase amount for 24 month promotions, or 2.7778% of such amount for 36 month promotions.

For all the promotion types shown above: Regular account terms apply to non-promotional purchases and, after promotion ends, to your promotional purchases. Offers are subject to credit approval. These promotional offers may not be available at all times for all purchases. Please see any special promotion advertising or other disclosures provided to you for the full terms of any special promotion offered.

## SECTION III: STANDARD PROVISIONS
## LOWE'S CREDIT CARD ACCOUNT AGREEMENT

### ABOUT THE CREDIT CARD AGREEMENT
**This Agreement.** This is an Agreement between you and Synchrony Bank, 170 Election Road, Suite 125, Draper, UT 84020, for your credit card account shown above. By opening or using your account, you agree to the terms of the entire Agreement. The entire Agreement includes the four sections of this document and the application you submitted to us in connection with the account. These documents replace any other agreement relating to your account that you or we made earlier or at the same time.
**Parties To This Agreement.** This Agreement applies to each accountholder approved on the account and each of you is responsible for paying the full amount due, no matter which one uses the account. We may treat each of you as one accountholder and may refer to each of you as "you" or "your". Synchrony Bank may be referred to as "we", "us" or "our".
**Changes To This Agreement.** We may change, add or delete terms of this Agreement, including interest rates, fees and charges.
**Special Promotions.** The terms of this Agreement apply to any special promotion. However, any special promotional terms that are different than the terms in this Agreement will be explained on promotional advertising or disclosures provided to you.

### HOW TO USE YOUR ACCOUNT/CARD
**Use Of Your Account.** You may use your account only for lawful personal, family or household purposes. You may use your account for purchases from Lowe's locations, including on Lowes.com. In addition to making purchases from Lowe's in the United States, your card can also be used to make purchases from any Lowe's store in Canada (each such purchase, a "Canadian Purchase"). See the Important Information About Your Account section for additional terms that will apply to each Canadian Purchase.
**You Promise To Pay.** You promise to pay us for all amounts owed to us under this Agreement.
**Your Responsibility.** Each accountholder will receive a card. You may not allow anyone else to use your account. If you do, or if you ask us to send a card to someone else, you will be responsible for paying for all charges resulting from their transactions.
**Purchase Limits.** To prevent fraud, we may limit the number or dollar amount of any type of purchases you can make in any particular amount of time. We also may decline any particular charge on your account for any reason.
**Credit Limit.** You will be assigned a credit limit that we may increase or decrease from time to time. If we approve a purchase that makes you go over your credit limit, we do not give up any rights under this Agreement and we do not treat it as an increase in either limit.

### HOW AND WHEN TO MAKE PAYMENTS
**When Payments Are Due.** You must pay at least the total minimum payment due on your account by 5 p.m. (ET) on the due date of each billing cycle. Payments received after 5 p.m. (ET) will be credited as of the next day. You may at any time pay, in whole or in part, the total unpaid balance without any additional charge for prepayment. If you have a balance subject to interest, earlier payment may reduce the amount of interest you will pay. We may delay making credit available on your account in the amount of your payment even though we will credit your payment when we receive it.
**Payment Options.** You can pay by mail, online or at a Lowe's store. We may allow you to make payments over the phone but we will charge you a fee to make expedited phone payments. Your payment must be made in U.S. dollars by physical or electronic check, money order or a similar instrument from a bank located in the United States.
**How To Make A Payment.** You must follow the instructions for making payments provided on your billing statement. If you do not, credit of your payment may be delayed up to five days. Your billing statement also explains how information on your check is used.
**Payment Allocation.** We will apply the required total minimum payment to balances on your account using any method we choose. Any payment you make in excess of the required total minimum payment will be applied to higher APR balances before lower APR balances. Applicable law may require or permit us to apply excess payments in a different manner in certain situations, such as when your account has a certain type of special promotion.

2

## INFORMATION ABOUT YOU

**Using And Sharing Your Information.** When you applied for an account, you gave us and Lowe's Companies, Inc. information about yourself that we could share with each other. Lowe's Companies, Inc. will use the information in connection with the credit program and for things like creating and updating its records and offering you special benefits. More information about how we use and share information is set forth in the privacy policy for your account.

**Address/Phone Change.** You agree to tell us right away if you change your address or phone number(s). We will contact you at the address or phone number in our records until we update our records with your new address or phone number.

**Consent To Communications.** You consent to us contacting you using all channels of communication and for all purposes. We will use the contact information you provide to us. You also consent to us and any other owner or servicer of your account contacting you using any communication channel. This may include text messages, automatic telephone dialing systems and/or an artificial or prerecorded voice. This consent applies even if you are charged for the call under your phone plan. You are responsible for any charges that may be billed to you by your communications carriers when we contact you.

**Telephone Monitoring.** For quality control, you allow us to listen to and/or record telephone calls between you and us.

## IMPORTANT INFORMATION ABOUT YOUR ACCOUNT

**Closing Your Account.** You may close your account at any time by sending a letter to the address shown on your billing statement or calling customer service. We may close your account at any time, for any reason. If your account is closed, you must stop using it. You must still pay the full amount you owe and this Agreement will remain in effect until you do.

**Collection Costs.** If we ask an attorney who is not our salaried employee to collect your account, we may charge you our collection costs. These include court costs and reasonable attorneys' fees.

**Credit Bureau Reporting.** We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be shown in your credit report. Tell us if you think we reported wrong information about you to a credit bureau. Write to us at P.O. Box 965005, Orlando, FL 32896-5005. Tell us what information is wrong and why you think it is wrong. If you have a copy of the credit report that includes the wrong information, send us a copy.

**Default.** You are in default if you make a late payment, do not follow any other term of this Agreement or become bankrupt or insolvent. If you default or upon your death, we may (a) request payment of the full amount due right away, (b) take legal action to collect the amounts owed, and/or (c) take any other action allowed.

**Disputed Amounts. The billing rights summary in section IV of this Agreement describes what to do if you think there is a mistake on your bill. If you send us correspondence about a disputed amount or payment, you must send it to the address for billing inquiries. We do not give up any rights under this Agreement if we accept a payment marked "payment in full" or given with any other conditions or limitations.**

**Unauthorized Use.** If your card is lost, stolen or used without your consent, call us immediately at 1-800-444-1408. You will not be liable for unauthorized use on your account, but you will be responsible for all use by anyone you give your card to or allow to use your account.

**Canadian Transactions.** The following additional terms will apply to each Canadian Purchase.

If you make or return a Canadian Purchase in Canadian dollars, we will convert the transaction amount into U.S. dollars using our currency conversion procedure. Under the currency conversion procedure that we currently use, the Canadian dollar transaction amount is converted into a U.S. dollar amount by multiplying the transaction amount in the Canadian dollar currency by a currency conversion rate. The currency conversion rate that we currently use is a prevailing foreign exchange rate selected in our discretion. The currency conversion rate that we use for a particular transaction is the rate in effect when we do the conversion. This rate may differ from the rate in effect when the Canadian Purchase or return occurred or when it was posted to your account, and may be higher or lower than the rate you could have gotten if you had converted U.S. dollars into Canadian dollars.

Returns of Canadian Purchases will be subject to Lowe's return policies. Under the return policies currently in effect, a Canadian Purchase can only be returned at a Lowe's store in Canada and cannot be returned at a Lowe's store in the United States. In the event that a United States Lowe's store does permit the return or exchange of the Canadian Purchase, the Lowe's store will not issue a credit to your account for the Canadian Purchase amount. For example, the United States Lowe's store, in its discretion, may provide you with other merchandise, a gift card or cash in exchange for the Canadian Purchase. The Canadian Purchase amount will continue to be a part of your account balance, and you will remain responsible for paying the Canadian Purchase amount.

## IMPORTANT INFORMATION ABOUT THIS AGREEMENT

**Assignment.** We may sell, assign or transfer any or all of our rights or duties under this Agreement or your account, including our rights to payments. We do not have to give you prior notice of such action. You may not sell, assign or transfer any of your rights or duties under this Agreement or your account.

**Enforceability.** If any part of this Agreement is found to be void or unenforceable, all other parts of this Agreement will still apply.

**Governing Law.** Except as provided in the Resolving a Dispute with Arbitration section, this Agreement and your account are governed by federal law and, to the extent state law applies, the laws of Utah without regard to its conflicts of laws principles. This Agreement has been accepted by us in Utah.

**Waiver.** We may give up some of our rights under this Agreement. If we give up any of our rights in one situation, we do not give up the same right in another situation.

## RESOLVING A DISPUTE WITH ARBITRATION

**PLEASE READ THIS SECTION CAREFULLY. IF YOU DO NOT REJECT IT, THIS SECTION WILL APPLY TO YOUR ACCOUNT, AND MOST DISPUTES BETWEEN YOU AND US WILL BE SUBJECT TO INDIVIDUAL ARBITRATION. THIS MEANS THAT: (1) NEITHER A COURT NOR A JURY WILL RESOLVE ANY SUCH DISPUTE; (2) YOU WILL NOT BE ABLE TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING; (3) LESS INFORMATION WILL BE AVAILABLE; AND (4) APPEAL RIGHTS WILL BE LIMITED.**

- **What claims are subject to arbitration**

  1. If either you or we make a demand for arbitration, you and we must arbitrate any dispute or claim between you or any other user of your account, and us, our affiliates, agents and/or Lowe's Companies, Inc. if it relates to your account, except as noted below.

  2. We will not require you to arbitrate: (1) any individual case in small claims court or your state's equivalent court, so long as it remains an individual case in that court; or (2) a case we file to collect money you owe us. However, if you respond to the collection lawsuit by claiming any wrongdoing, we may require you to arbitrate.

  3. Notwithstanding any other language in this section, only a court, not an arbitrator, will decide disputes about the validity, enforceability, coverage or scope of this section or any part thereof (including, without limitation, the next paragraph of this section and/or this sentence). However, any dispute or argument that concerns the validity or enforceability of the Agreement as a whole is for the arbitrator, not a court, to decide.

- **No Class Actions**

  **YOU AGREE NOT TO PARTICIPATE IN A CLASS, REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL ACTION AGAINST US IN COURT OR ARBITRATION. ALSO, YOU MAY NOT BRING CLAIMS AGAINST US ON BEHALF OF ANY ACCOUNTHOLDER WHO IS NOT AN ACCOUNTHOLDER ON YOUR ACCOUNT, AND YOU AGREE THAT ONLY ACCOUNTHOLDERS ON YOUR ACCOUNT MAY BE JOINED IN A SINGLE ARBITRATION WITH ANY CLAIM YOU HAVE.**

  If a court determines that this paragraph is not fully enforceable, only this sentence will remain in force and the remainder will be null and void, and the court's determination shall be subject to appeal. This paragraph does not apply to any lawsuit or administrative proceeding filed against us by a state or federal

3

government agency even when such agency is seeking relief on behalf of a class of borrowers, including you. This means that we will not have the right to compel arbitration of any claim brought by such an agency.

- **How to start an arbitration, and the arbitration process**

1. The party who wants to arbitrate must notify the other party in writing. This notice can be given after the beginning of a lawsuit or in papers filed in the lawsuit. Otherwise, your notice must be sent to Synchrony Bank, Legal Operation, P.O. Box 29110, Shawnee Mission, KS 66201-5320, ATTN: ARBITRATION DEMAND. The party seeking arbitration must select an arbitration administrator, which can be either the American Arbitration Association (AAA), 1633 Broadway, 10th Floor, New York, NY 10019, www.adr.org, 1-800-778-7879, or JAMS, 620 Eighth Avenue, 34th Floor, New York, NY 10018, www.jamsadr.com, 1-800-352-5267. If neither administrator is able or willing to handle the dispute, then the court will appoint an arbitrator.

2. If a party files a lawsuit in court asserting claim(s) that are subject to arbitration and the other party files a motion with the court to compel arbitration, which is granted, it will be the responsibility of the party asserting the claim(s) to commence the arbitration proceeding.

3. The arbitration administrator will appoint the arbitrator and will tell the parties what to do next. The arbitrator must be a lawyer with at least ten years of legal experience. Once appointed, the arbitrator must apply the same law and legal principles, consistent with the FAA, that would apply in court, but may use different procedural rules. If the administrator's rules conflict with this Agreement, this Agreement will control.

4. The arbitration will take place by phone or at a reasonably convenient location. If you ask us to, we will pay all the fees the administrator or arbitrator charges, as long as we believe you are acting in good faith. We will always pay arbitration costs, as well as your legal fees and costs, to the extent you prevail on claims you assert against us in an arbitration proceeding which you have commenced.

- **Governing Law for Arbitration**

This Arbitration section of your Agreement is governed by the Federal Arbitration Act (FAA). Utah law shall apply to the extent state law is relevant under the FAA. The arbitrator's decision will be final and binding, except for any appeal right under the FAA. Any court with jurisdiction may enter judgment upon the arbitrator's award.

- **How to reject this section**

You may reject this Arbitration section of your Agreement. If you do that, only a court may be used to resolve any dispute or claim. To reject this section, you must send us a notice within 60 days after you open your account or we first provided you with your right to reject this section. The notice must include your name, address and account number, and must be mailed to Synchrony Bank, P.O. Box 965012, Orlando, FL 32896-5012. This is the only way you can reject this section.

# SECTION IV: OTHER IMPORTANT INFORMATION
# LOWE'S CREDIT CARD ACCOUNT AGREEMENT

This section of the agreement includes state notices, billing rights summary and rewards terms (if applicable) and is not required to be provided as part of the request for customer agreement.

**SYNCHRONY BANK**
**VARIABLE TERMS ADDENDUM**
**FOR YOUR LOWE'S  CREDIT  CARD  ACCOUNT**
**ENDING IN XXXX**

**Minimum Payment Calculation**

Your total minimum payment is calculated as follows.

The sum of:

A. The greater of:

    **1.** $25 (which includes any past due amounts)

    OR

    **2.** The sum of the following amounts, rounded up to the next highest whole dollar:

        a. Any past due amounts; PLUS

        b.1% of your new balance (excluding any balance in connection with a special promotional purchase with a unique payment calculation) shown on your billing statement; PLUS

        c. Any late payment fees charged in the current billing cycle; PLUS

        d. All interest charged in the current billing cycle; PLUS

        e. Any payment due in connection with a special promotional purchase with a unique payment calculation.

PLUS

B. The monthly charges for any optional credit insurance or debt cancellation product you have elected to purchase for your account.

Your total minimum payment will never be more than your new balance.

LOWE'S P LCC
PLC1%$25.VTA