UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LEA REICH on behalf of herself and
all others similarly situated,

                    Plaintiff,

        -against-

MIDLAND CREDIT MANAGEMENT, INC.,
MIDLAND FUNDING, LLC,
AND ENCORE CAPITAL GROUP, INC.,

                    Defendants.

1:15-cv-07195-SJ-RML

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MEMORANDUM IN
<u>SUPPORT OF MOTION TO COMPEL ARBITRATION</u>**

# TABLE OF CONTENTS

I.      Backround ........................................................................................................................ 1

II.     Defendants' have the *initial* burden of demonstrating by competent evidence that there
        are no genuine issuesof material fact regarding whether Plaintiff entered into a valid
        agreement to arbitrate this dispute. ..................................................................................... 6

III.    Defendants have not met their *initial* burden of demonstrating that Plaintiff agreed to
        arbitrate this dispute. ......................................................................................................... 9

        A.      Defendants submitted the *wrong* Credit Card Agreement and the wrong
                Credit Card information and has therefore failed to meet their *initial*
                burden that an agreement to arbitrate was made....................................................... 9

        B.      Defendants must submit an authenticated cardmember agreement
                containing the purported arbitration agreement and by admissible evidence
                tendered by a competent witness of assignment of Plaintiff's specific
                account. .......................................................................................................... 18

        C.      Defendants admit they cannot testify when the agreement was sent..................... 25

        D.      Defendants have provided no evidence that the initial agreement contained
                a provision that plaintiff would be subject to change in terms notices
                mailed to plaintiff............................................................................................ 28

        E.      Midland defendants offered no acceptable evidence to demonstrate the
                existence of a genuine issue of material fact concerning the existence of an
                arbitration agreement, its motion to compel arbitration must be denied as a
                matter of law without the need for discovery or trial........................................... 31

IV.     Conclusion ...................................................................................................................... 33

## I.   **BACKGROUND**

Defendants have moved to compel arbitration and in doing so they rely on an arbitration clause contained in a card-member agreement that was part of a purported change in terms between Banana Republic Visa and Lea Reich. Midland proffers the Affidavit of Angel Nayman, "as lead litigation analyst" who declares "This affidavit is made on behalf of non-party Synchrony Bank," and that she is "familiar with the manner in which Synchrony's credit card account records and accounts are maintained." Declaration of Angel Nayman ("Nayman Decl.") at 1. She states that "[i]n this position I have personal knowledge of the business records of synchrony and I am qualified person authorized to declare and certify on behalf of Synchrony." Id. Further, she states "Synchrony's records show that on December 21, 2003, a *Banana Republic* account was applied for in the name of Lea Reich. That same day, Synchrony approved Lea Reich's application and opened a *Banana Republic* credit card account in her name with the last four digits -1177.

Nayman goes on to state that "On or about March 10, 2008, Synchrony's records indicate that, pursuant to Lea Reich's request, her Banana Republic account was upgraded to a Banana Republic Visa account ending in 8020 (the "Account"). On or about March 10, 2008, the Banana Republic Visa card was mailed to Lea Reich at the address on the Account of 1871 551h Street, Brooklyn, NY 11204-1907. Enclosed in the mailing of the credit card was a copy of the effective credit card agreement that governed the Account ("Synchrony Account Agreement") attached hereto as Exhibit A. Nayman did not attach any of Synchrony's records.

Nayman then goes on to state that "A change in terms for the Account was also sent to this address in June 2012 and is attached hereto as Exhibit B." Id. A copy of the change in the terms is attached to the declaration." Nayman does not testify that this statement was made based on an investigation of Synchrony's records.

Nayman does not testify that Synchrony's records indicate that the change in terms was sent in June 2012, rather Nayman just spuriously concludes that: "A change in terms for the Account was also sent to this address in June 2012."

Nayman provides no date in June 2012 when the change in terms for the account was sent. Nayman admits that there is otherwise no records or evidence that the agreement was mailed to Lea Reich. Id. The document is missing a date as well as a copyright date and appears to be a standard preprinted form that does not include a signature line for either party. Id. The document states that it is a "*GAP, INC.* VISA ACCOUNT AGREEMENT" not a "*BANANA REPUBLIC* VISA ACCOUNT AGREEMENT;" it is also missing the cover page or letter. Id. The credit card number is not shown despite the fact that this supposed change in terms specifically states: "This is an Agreement for your Credit Card shown above." Id. The print is small and the quality of the reproduction is poor. Id.

Nayman further states that: "Synchrony's records reflect that Lea Reich made her last payment on the Account on July 4, 2013.  Attached hereto as Exhibit C is a true and correct copy of the monthly statement relating to Lea Reich's Account that references Lea Reich's last payment." This Credit Card statement attached as Exhibit C is for a *Banana Republic* Visa Credit Card account it is *not* a statement for a *Gap, Inc* Visa Credit Card account. Additionally, Nayman has not stated when any of the purchases were made.

Midland defendants also submits the affidavit of Michael Burger, Director, Legal Collections Operations, for Midland Credit Management, Inc., who states that he is "responsible for, among other things, maintaining and overseeing 'media,' e.g., the loan agreements, debt collection records and other account information pertaining to accounts and debt that MCM manages for Midland Funding, LLC." Affidavit of Michael Burger ("Burger Aff.") at 1.

He states that on November 26, 2014 Midland purchased Lea Reich's account and he attaches an undated copy of the bill of sale of the portfolio of accounts that were sold to Midland Funding Id. at 2.  The purchase agreement is not attached to the Affidavit.

The bill of sale attached to the affidavit provides that for value received … Seller hereby transfers …its ownership the Receivables as set forth in the Notification files (as defined in the Agreement), Delivered by the seller to Buyer on November 21, 2014 and as further described in the agreement. Id., Burger Aff., Ex. 1. However, there are no "Notification files" or agreement attached. See id. The "date of the sale" "number of accounts," "total unpaid balance," "premium" and "due seller" information on the bill of sale document has not been attached nor was any information indicating that Lea Reich's account was part of the sale.

Also submitted by Mr. Burger is a one-page document entitled "AFFIDAVIT OF SALE OF ACCOUNT BY ORINIGAL CREDITOR" which he states is "further evidencing the sale of these charged off debt to MF."  The document shows a different sale date of November 19, 2014. The date of the agreement attached at exhibit 1 is November 21, 2014. According to Mr. Burger the date of the purchase was November 26, 2014. The bottom of the AFFIDAVIT OF SALE OF ACCOUNT BY ORINIGAL CREDITOR surprisingly contains the date of June 2, 2014. This document entitled AFFIDAVIT OF SALE OF ACCOUNT BY ORINIGAL CREDITOR does not contain Lea Reich's account number. Id.

In opposition to the motion to compel, plaintiff submits an affidavit ("Reich Aff.") a summary of her statement follows:

In December of 2003, [she] visited a *Banana Republic* store and applied for a *Banana Republic* credit card" [she] made use of this *Banana Republic* credit card from 2003 until 2007. In December of 2007, [she] was sent a letter stating that the regular *Banana Republic* Credit card

program was ending on December 31, 2007 and that [her] regular *Banana Republic* Credit card was going to be automatically upgraded to a *Banana Republic* Visa account.

The letter sent to [her] in December of 2007 did not contain any new terms and conditions. [She] had not requested that [her] regular *Banana Republic* Credit card be converted into a *Banana Republic* Visa account. Once the regular *Banana Republic* Credit card program had ended, the *Banana Republic* Credit Card was automatically upgraded to a *Banana Republic* Visa account. In the beginning of January 2008, [she] received [a] new *Banana Republic* visa card ending in 4112. And "all that came in that envelope was the new *Banana Republic* Visa Credit Card with a sticker that stated that I need to call to activate.

After receipt [she] called the number on the sticker and activated [the] card. [She] also confirmed with the representative that [the] prior rewards from *Banana Republic* credit card were in fact transferred to [her] new *Banana Republic* Visa card ending in 4112. At no point after receipt of [her] *Banana Republic* Visa card ending in 4112, did [she] receive any new rewards information or terms and conditions. [She] used [the] *Banana Republic* Visa card ending in 4112 from January of 2008 until July of 2008, at which point [she] saw a fraudulent charge of around $1,900.00 on [the] *Banana Republic* Visa card ending in 4112. *Banana Republic Visa* closed the Visa Credit Card ending in 4112, and sent a new *Banana Republic* Visa card. Sometime in July of 2008, after [the] *Banana Republic* Visa card ending in 4112 had been closed, [she] received [the] new *Banana Republic* Visa card ending 8020 as a replacement of *Banana Republic* Visa card ending in 4112.

The new *Banana Republic* Visa card ending in 8020 was a replacement card and it came with no new rewards information nor did it come with any new terms and conditions. The new *Banana Republic* Visa account did not end in 8020 but rather ended in 4112. The new *Banana Republic* Visa account ending in 4112 was sent in the beginning of January, 2008 not on March

10, 2008. The *Banana Republic* Visa account ending in 8020 which replaced the account ending in 4112 was not sent on March 10, 2008 rather it was only sent after July 2008. This agreement was not sent in June 2012 and [she] never received this agreement in June 2012 or at any other time prior to seeing the motion to compel.

Midland failed to allege a date when the "change in terms for the account" was sent.  But Midland has attempted to produce a copy of that supposed "change in terms of the account." Yet instead, it produced a fictitious sample of a *Gap, Inc.* Visa Credit Card account agreement.  It is undisputed that [she] never had a *Gap, Inc.* Visa Credit Card. [she] only had a *Banana Republic* Visa card [she] never received any *Gap, Inc.* Visa account agreement in June of 2012. The sample *Gap, Inc.* Visa account-agreement attached to Midland's motion to compel states (Section III) "This is an Agreement for your Credit Card shown above." the motion to compel is <u>most importantly</u> missing the initial letter or cover page that would contain the *Gap, Inc.* Visa Credit Card number shown above.

 [A]ny such agreement is a nullity since [she] never had a *Gap, Inc.* Visa Credit Card and [she] would not have -and could not have- assented to its terms. [I]t is self-understood that even if this "*Gap, Inc.* Visa Credit Card account agreement," was dated and was sent on a specific date, (which of course it was not) it would be a nullity since the receipt of the wrong agreement can bind no one.

[She] never received any Credit Card agreement when [she] received [the] *Banana Republic* Visa Credit Card ending in 4112 or 8020. The only agreement that binds [her] to [the] *Banana Republic* Visa Credit Card ending in 4112 or 8020 is the original agreement signed on December 21 2003. The original December 21 2003 agreement did not contain any arbitration

requirement. The original agreement did not contain a provision that stated that [she] would be subject to change in the terms notices mailed to [her].

The undated fictitious agreement that Midland has manufactured does not state that "The Gap Visa Card, Banana Republic Visa Card, will be referred to as the "Gap Inc. Visa Card."[she] has never contracted with Midland, nor did [she] agree to arbitrate any dispute that [she has] with Midland.  [she] did not know, nor could [she] have known, that Midland would claim that [she] had waived my rights. Midland has failed to produce the only agreement that binds [her] to [the] *Banana Republic* Visa Credit Card 4112 and 8020 which is the original card member agreement and application singed on December 21 2003. Midland does not and cannot have first-hand knowledge of the facts yet with exhaustive effort it has in fact manufactured documents and facts that on their face are irredeemably false, self-contradictory, and very troubling.

## II.    **DEFENDANTS HAVE THE *INITIAL* BURDEN OF DEMONSTRATING BY COMPETENT EVIDENCE THAT THERE ARE NO GENUINE ISSUES OF MATERIAL FACT REGARDING WHETHER PLAINTIFF ENTERED INTO A VALID AGREEMENT TO ARBITRATE THIS DISPUTE.**

The Second Circuit standard to determine whether a claim is subject to arbitration under the FAA is "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Merchs.' Litig.*, 667 F.3d 204, 190 (2d Cir.2012) ("Amex III"); *Schnabel v. Trilegiant*, 697 F.3d 110, 118 (2d Cir. 2012). "On a motion to compel arbitration, the moving party has the initial burden of showing that an agreement to arbitrate exists." *Carvant Financial LLC v. Autoguard Advantage Corp.*, No. 13–CV–00872 (ADS)(AKT), 2013 WL 3991471, at *3 (August 5, E.D.N.Y. 2013) and must do so by admissible evidence, See *Dedon GmbH v. Janus et Cie,* 411 F. App'x 361, 363 (2d Cir. 2011), citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2855 (2010) ("*Granite Rock* reconfirms this circuit's well-established precedent that where

a party challenges the very existence of the contract containing an arbitration clause, a court cannot compel arbitration without first resolving the issue of the contract's existence").

The party seeking to compel arbitration "<u>must make a prima facie *initial* showing that an agreement to arbitrate existed **before** the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'</u>" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010). (emphasis added)

Where the party is seeking to enforce an arbitration clause in a contract obtained by assignment, it must include proof of a full chain of assignment of that right in the specific account at issue. *Webb v. Midland Credit Mgmt., Inc.*, 11 C 5111, 2012 WL 2022013 (N.D. Ill. May 31, 2012) (without all documents evidencing assignment of account, debt buyer defendants "cannot show an unbroken chain of assignment entitling them to stand in Citibank's shoes and enforce the arbitration provision contained in Webb's credit card agreement")

The party seeking arbitration must demonstrate "undisputed facts in the record require[ ] the issue of arbitrability to be resolved against the [p]laintiff as a matter of law…" *Shetiwy v. Midland Credit Mgmt.*, 12 CIV. 7068 SAS, 2013 WL 3530524 at * 1 (S.D.N.Y. July 12, 2013).

In determining whether such disputed facts exist, "[t]he inferences to be drawn from the underlying affidavits, exhibits, must be viewed in the light most favorable to the party opposing the [summary judgment] motion.' *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir. 1989))." *Carvant Financial LLC v. Autoguard Advantage Corp.*, No. 13–CV–00872 (ADS) (AKT), 2013 WL 3991471, at *2 (August 5, E.D.N.Y. 2013).

"Arbitration is a matter of contract." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002) (internal citation and quotation marks omitted). Although the Federal Arbitration Act ("FAA") promotes a "liberal federal policy favoring arbitration agreements" and "establishes that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983), "the purpose of Congress [in enacting the FAA] was to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967). "[T]he law . . . requires that parties actually agree to arbitration before it will order them to arbitrate a dispute." *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003). Consequently, the party seeking to compel arbitration bears the *initial* burden of establishing that a binding agreement to arbitrate was formed. *Dreyfuss v. eTelecare Global Solutions-U.S. Inc.*, 349 F. App'x 551, 555 (2d Cir. 2009). To the extent there are ambiguities in contract terms, the common law rule of construction against the drafter applies. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 58, 115 S. Ct. 1212, 131 L. Ed. 2d 62 (1995).

If Midland fails to "make a prima facie *initial* showing that an agreement to arbitrate existed," the motion to compel arbitration must be denied. *Hines v. Overstock.com,* Inc., 380 F. App'x 22, 24 (2d Cir. 2010).

It will be shown below that Defendants have not met their *initial burden* for numerous reasons.

**III.    DEFENDANTS HAVE NOT MET THEIR *INITIAL* BURDEN OF DEMONSTRATING THAT PLAINTIFF AGREED TO ARBITRATE THIS DISPUTE.**

   **A.    Defendant submitted the *wrong* Credit Card Agreement and the wrong Credit Card information and has therefore failed to meet its *initial* burden that an agreement to arbitrate was made.**

In December of 2003, Reich visited a *Banana Republic* store and applied for a *Banana Republic* credit card". Reich made use of this *Banana Republic* credit card from 2003 until 2007. In December of 2007, Reich was sent a letter stating that the regular *Banana Republic* Credit card program was ending on December 31, 2007, and that Reich's regular *Banana Republic* Credit card was going to be automatically upgraded to a *Banana Republic* Visa account.

The letter sent to Reich in December of 2007 did not contain any new terms and conditions. Reich had not requested that her regular *Banana Republic* Credit card be converted into a *Banana Republic* Visa account. Once the regular *Banana Republic* Credit card program had ended, the *Banana Republic* Credit Card was automatically upgraded to a *Banana Republic* Visa account. In the beginning of January 2008, Reich received the new *Banana Republic* visa card ending in 4112. This card did not end in 8020 and the card ending in 4112 came in beginning of January 2008 right after the *Banana Republic* Credit card program had ended.  And, all that came in that envelope, was the new *Banana Republic* Visa Credit Card with a sticker that stated that Reich needed to call to activate.

After receipt of the card ending in 4112, Reich called the number on the sticker and activated the card.  Reich also confirmed with the representative that the prior rewards from *Banana Republic* credit card were in fact transferred to my new *Banana Republic* Visa card ending in 4112. At no point after receipt of Reich's *Banana Republic* Visa card ending in 4112, did Reich receive any new rewards information or terms and conditions.

Reich used the *Banana Republic* Visa card ending in 4112 from January of 2008 until July of 2008, at which point she saw a fraudulent charge of around $1,900.00 on the *Banana Republic* Visa card ending in 4112. *Banana Republic Visa* closed the Visa Credit Card ending in 4112, and sent a new *Banana Republic* Visa card. Sometime in July of 2008, after the *Banana Republic* Visa card ending in 4112 had been closed, she received the new *Banana Republic* Visa card ending 8020 as a replacement of *Banana Republic* Visa card ending in 4112.

The new *Banana Republic* Visa card ending in 8020 was a replacement card and it came with no new rewards information nor did it come with any new terms and conditions. The new *Banana Republic* Visa account did not end in 8020 but rather ended in 4112. The new *Banana Republic* Visa account ending in 4112 was sent in the beginning of January, 2008 not on March 10, 2008. The *Banana Republic* Visa account ending in 8020 which replaced the account ending in 4112 was not sent on March 10, 2008 rather it was only sent after July 2008.

No agreement was sent in June 2012 and Reich never received any agreement in June 2012 or at any other time prior to seeing the motion to compel. Reich Aff. at  3.

Midland failed to allege a date when the "change in terms for the account" was sent. Midland has attempted to produce a copy of that supposed "change in terms of the account," yet instead, it produced a fictitious sample of a *Gap, Inc.* Visa Credit Card account agreement.  It is undisputed that Reich never had a *Gap, Inc.* Visa Credit Card. Reich only had a *Banana Republic* Visa card and never received any *Gap, Inc.* Visa account agreement in June of 2012. Reich Aff. at p. 3-4

Midland admits that the Credit Card statements Reich received were only from *Banana Republic* Visa card. Midland does not dispute the fact that Reich only applied for a *Banana*

*Republic* credit card. Midland admits that Reich only had a *Banana Republic* Visa card and did not ever have a *Gap, Inc.* Visa Credit Card.

Parties who sign the wrong contract have essentially assented to nothing. In this case, there is no claim by Midland that they possess a signed agreement to arbitrate, rather they have produced an unsigned and undated copy of the wrong Credit Card agreement that they admit they don't know the date it was sent. Ms. Nayman in her affidavit did not have the audacity to state that this incorrect *Gap Inc* Visa Credit Card agreement is a "True and Correct copy" of Reich's agreement.

Even if Ms. Nayman had testified that the bank sent this agreement it is axiomatic that if the bank sends the "wrong Credit Card Agreement," the wrong agreement can never bind anyone.

Midland admits that they do not possess a signed contract, and they admit that they cannot testify to a date when the supposed arbitration agreement was sent. However, assuming *arguendo* that it was sent, it is undeniable that in a case where a party signs the wrong contract such a contract is a nullity, and it leaves the parties without a meeting of the minds. Consequently, all subsequent transactions cannot be governed by the wrong contract.

It is clear from the agreement that Midland produced that there was no meeting of the minds, and no contract was ever formed. Under New York contract law, the fundamental basis of a valid enforceable contract is a meeting of the minds of the parties. If there is no meeting of the minds on all essential terms, there is no contract. This motion to compel must fail because it is clear from the record that there was no meeting of the minds, and no contract was ever formed.

This is because an enforceable contract requires mutual assent to essential terms and conditions thereof. The *Gap Inc* Credit Card is a Credit Card agreement for a different *Gap* Credit Card the parties admit that Reich did not have a *Gap Inc.* Visa Credit card, this difference is inescapable and it is significantly essential, it proves that there was no meeting of the minds and

11

no agreement to arbitrate. *Dreyfuss v. eTelecare Glob. Sols.-US, Inc.,* 349 F. App'x 551, 554 (2d Cir. 2009) ("This argument fails because it is clear from the record that there was no meeting of the minds, and no contract was ever formed... [T]he fundamental basis of a valid enforceable contract is a meeting of the minds of the parties. If there is no meeting of the minds on all essential terms, there is no contract. This is because an enforceable contract requires mutual assent to essential terms and conditions thereof ... This difference is significant and indicates that there was no meeting of the minds as to an agreement to arbitrate.")

Signatures on the wrong contact are rendered null and void. Such a defect is not cured by the failure to recognize that the wrong contract was signed, since the wrong contract - even if signed by both parties - cannot bind parties to an erroneous set of terms. It follows that any clause contained in the wrong contract even an arbitration clause, is a nullity and would bind no one. Any party who erroneously signs the wrong contract may ignore the terms, resist it or assert its invalidity at any and all times. *Opals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362, 372 (2d Cir. 2003) ("Under New York contract law . . . [i]f there is no meeting of the minds on all essential terms, there is no contract. This is because an enforceable contract requires mutual assent to the essential terms and conditions thereof.")

In this case, it is undisputed that the only application and agreement that Reich signed was on December 21, 2003, and it was in a *Banana Republic* store with *Banana Republic* for a *Banana Republic* Credit Card however Midland has failed to produce that agreement.

The erroneous sample *Gap, Inc.* Visa account-agreement attached to Midland's motion to compel states (Section III) "**This is an Agreement for your Credit Card shown above**." The motion to compel is <u>most importantly</u> missing the – most essential terms namely - the initial letter and cover page that would contain the *Gap, Inc.* Visa Credit Card number shown above. Moreover,

under New York law a party seeking to enforce a contract must prove not only the existence of the contract, but also its terms.

Thus, even if an agreement did exist in this case, that agreement is not enforceable because Midland, as the non-signatory party seeking enforcement, has failed to prove the agreements terms. The Credit Card number shown above is missing and so is the initial letter. Finally, even if Midland will try to testify as to the missing contents (i.e. Credit Card number, Cover Letter) of the *Gap, Inc* Visa Agreement's omitted pages, Midland does not have any knowledge about the missing terms and pages of this agreement since they are a non-signatory party and Midland similarly can make no offer of specific proof beyond mere conjecture and speculation to fill in the very considerable blanks namely the missing cover letter and the Credit Card number that was supposedly shown above. *Dreyfuss v. eTelecare Glob. Sols.-US, Inc.*, 349 F. App'x 551, 555 (2d Cir. 2009) ("Moreover, under New York law a party seeking to enforce a contract must prove not only the existence of the contract, but also its terms. Finally, [Defendant's] contention that this Court should remand this case so the district court can hold a trial at which "[t]he parties can present oral testimony to prove the contents of the Agreement's missing pages" is baseless. On this appeal, [defendant] similarly makes no offer of specific proof beyond mere speculation that oral testimony can fill in the very considerable blanks at issue here.") *see also Hallmark v. Cohen & Slamowitz, LLP*, No. 11-CV-842S, 2013 WL 5178128, at *4 (W.D.N.Y. Sept. 16, 2013) (rejecting debt collector's reliance on partial credit card agreement where "no indication" that customer signed it).

As mentioned above, any such agreement is a nullity since Reich never had a *Gap, Inc.* Visa Credit Card and she would not have - and could not have - assented to its terms. It is self-understood that even if this "*Gap, Inc.* Visa Credit Card account agreement," was dated and was

sent on a specific date, (which of course Midland has admitted it was not) it would be a nullity since the receipt of the wrong agreement can bind no one.  Because there can be no meeting of the minds of the parties when the wrong agreement is sent, no contract existed in the case at hand even if sent.

Reich never received any Credit Card agreement when she received the *Banana Republic* Visa Credit Card ending in 4112 or 8020. The only agreement that binds Reich to the *Banana Republic* Visa Credit Card ending in 4112 or 8020 is the original agreement signed on December 21, 2003.  The original December 21, 2003 agreement did not contain any arbitration requirement. The original agreement did not contain a provision that stated that Reich would be subject to change in the terms notices mailed to [her]. Reich Aff. at  5

The undated fictitious sample agreement that Midland has manufactured for its motion to compel arbitration does not state that "The Gap Visa Card, Banana Republic Visa Card, will be referred to as the "Gap Inc. Visa Card."

Reich has never contracted with Midland, nor did she agree to arbitrate any dispute that she has with Midland.  She did not know, nor could she have known, that Midland would claim that she had waived her rights. Midland has failed to produce the only agreement that binds her to her *Banana Republic* Visa Credit Card 4112 and 8020 which was the original card member agreement and application singed on December 21 2003. Reich Aff. at  5

To satisfy the requirement of authenticating or identifying an agreement into evidence, the movant must produce evidence sufficient to support a finding that the item is what the movant claims it is." Fed. R. Evid. 901. In other words, Midland must prove that the proffered credit agreements are the correct credit agreements that apply to plaintiff's credit accounts.

14

Midland has offered no evidence that the proffered agreements apply to plaintiff beyond a bare conjectural statement from Angel Nayman, that "A change in terms for the Account was also sent to this address in June 2012" which the court must disregard as a gossamer inference. This bare speculation alone does not contain any facts and cannot be considered trustworthy. Defendant further explains (Memo of law at 3.) "By using her Account, Plaintiff agreed to all terms of the agreement which include the Terms & Conditions." However, here, defendant has presented no evidence that the bank sent the agreement, neither did they provide any evidence that plaintiff received the modified credit card agreements, or that plaintiff received notice that such agreements were binding upon further use of the card, and that plaintiffs subsequently used the credit cards. Defendant also argues that, because plaintiff used the credit cards, the terms of the agreements are binding.

Defendants do not show that plaintiff used the card, but even if they had shown that the card was used, it is self-understood that although a plaintiff's alleged use of a credit card would imply consent to some agreement, such use definitely does not indicate consent to the wrong undated agreement submitted by defendant. *See Chase Bank, USA v. Leggio*, 997 So. 2d 887, 890 (La. Ct. App. 2008) ("[T]he mere use of a credit card would not logically give rise to the presumption that the consumer thereby understood that he was consenting to arbitration of any dispute concerning such use, particularly when there has not been a showing that the debtor received notice of the alleged arbitration clause."); *NCO Portfolio Mgmt. v. Gougisha*, 985 So. 2d 731, 737 (La. Ct. App. 2008) ("We reject the argument of NCO, FIA, and MBNA that the simple use of a credit card binds a credit card holder to all terms and conditions that the issuers wishes to unilaterally impose without some proof of notice and consent.")

In addition, as set forth above, defendant fails to provide evidence that it sent or that plaintiff received or knew of the modified agreements or subsequently used the credit cards. The Court should find that defendant has failed to establish that the proffered credit agreements are the agreements that apply to plaintiff, and therefore, the Court should exclude the credit agreements for failure to authenticate.

Defendant cannot offer any other evidentiary support of an agreement committing plaintiff's claims to arbitration, and accordingly, defendants' motion to compel arbitration must be denied. See *Hinten v. Midland Funding, LLC,* No. 2:13 CV 54 DDN, 2013 U.S. Dist. LEXIS 151383, at *12 (E.D. Mo. Oct. 22, 2013)

> "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. Stated otherwise, defendant must prove that the proffered credit agreements *are* the credit agreements that apply to plaintiffs' credit accounts...Defendant offers no evidence that the proffered agreements apply to plaintiffs beyond [Midland's employee's] bare statement, which the court disregards as a legal conclusion, and records indicating that plaintiffs maintained credit accounts. Defendant explains that credit card agreements are frequently modified, implying that the proffered credit card agreements were subsequently modified by plaintiffs and defendant's assignors." However "[H]ere, defendant has presented no evidence that plaintiffs received the modified credit agreements, that plaintiffs received notice that such agreements were binding upon further use of the card, and that plaintiffs subsequently used the credit cards. Defendant also argues that, because plaintiffs used the credit cards, the terms of the agreements are binding. Although plaintiffs' alleged use of the credit cards implies consent to some agreement, such use does not indicate consent to the specific terms submitted by defendant." In addition "as set forth above, defendant fails to provide evidence that plaintiffs received or knew of the modified agreements or subsequently used the credit cards. The court finds that defendant has failed to establish that the proffered credit agreements are the agreements that apply to plaintiffs, and therefore, excludes the credit agreements for failure to authenticate. Defendant offers no other evidentiary support of an agreement committing plaintiffs' claims to arbitration, and accordingly, defendant's motion to compel arbitration is denied." (emphasis added)

Midland does not and cannot have first-hand knowledge of the facts yet with exhaustive effort they have in fact manufactured documents and facts that on their face are irredeemably false, self-contradictory and very troubling.

As a threshold matter, the defendants have not sustained their *initial* burden of proving the existence of a valid contract, let alone a contract in which Lea Reich assented to arbitrate with Midland. The documents Midland has submitted not only fail that test on its face, but also call in

to question Midland general credibility. Midland has provided no proof that Reich ever executed or received any of these Agreements. *See Bernhart v. Asta Funding, Inc.* 1:13-cv-02935 Doc 63, (S.D.N.Y. Dec 16, 2013) (Patterson J,.) ("[T]he [debt buyer] had failed to establish that a binding agreement was made between any of the Plaintiffs and any of the Defendants requiring arbitration. (See 12/3/13 Tr. at 47.) See also *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 201 0) ("[A] party seeking to invoke FAA § 4 must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement in issue.")") *Henggeler v. [Midland Funding, et al],* 894 F. Supp. 2d 1180, 1187 (D. Neb. 2012) (denying Midlands motion to compel arbitration because a debt buyer failed to demonstrate that "a valid agreement to arbitrate exists" and "submitted only a generic cardmember agreement from Chase Bank" that was "unsigned").

The party seeking to dismiss a case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made. See *Hines,* 380 Fed. Appx. at 24; citing *Almacenes Fernandez, S.A. v. Golodetz,* 148 F.2d 625, 628 (2d Cir. 1945). In deciding whether an arbitration agreement has been formed, the court uses a summary judgment standard. *Bensadoun v. Jobe-Riat,* 316 F.3d 171 , 175 (2d Cir. 2003).

There can be no issue of fact as to a *prima facie* showing if on its face the documents produced are wrong, contradictory, incomplete, undated, and unsigned and they are unauthenticated generic sample copies which Midland admittedly lacks proof of being sent.

There is no genuine issue of material fact as to whether the parties reached a meeting of the minds as to the material terms of any agreement; the evidence in the record shows that they did not. Therefore, even if this Court were to accept Midland's invitation to consider an agreement other than the correct Agreement, this Court must still conclude that no genuine issue of fact exists

as to whether there was a valid contract between the parties. *Opals on Ice Lingerie, Designs by Bernadette, Inc. v. Bodylines Inc.,* 320 F.3d 362, 372 (2d Cir. 2003) ("There is no genuine issue of material fact as to whether [the parties] reached a meeting of the minds as to the material terms of any agreement; the evidence in the record shows that they did not. Therefore, even if we were to accept [the movant's] invitation to consider agreements other than the [correct] Agreement, we conclude that no genuine issue of fact exists as to whether there was a valid contract between the parties")

### B.   Defendants must submit an authenticated cardmember agreement containing the purported arbitration agreement and by admissible evidence tendered by a competent witness of assignment of Plaintiff's specific account.

Absent proof of assignment, a debt collector cannot even begin to seek to compel arbitration from an agreement with the original creditor. *See, e.g. Britton v. Co–Op Banking Group,* 4 F.3d 742, 746 (9th Cir.1993) ("An assignee of a contractual right must prove the validity of his ownership claims"); *Hagy v. Demers & Adams, LLC,* 2:11-CV-530, 2011 WL 5325486 at * 2, 3 (S.D. Ohio Nov. 2, 2011); *Webb v. Midland Credit Mgmt., Inc.*, 11 C 5111 at 1, 2012 WL 2022013 (N.D. Ill. May 31, 2012); see *also Hinkle, Cox, Eaton, Coffield & Hensley v. Cadle Co.,* 111 Ohio App.3d 713, 676 N.E.2d 1256, 1258 (Ohio Ct.App.1996) (quoting *Zwick v. Zwick,* 103 Ohio App. 83, 134 N.E.2d 733, 734 (Ohio Ct.App.1956) (" 'an assignee of a claim must allege and prove the assignment.' "). Other decisions bear out this general rule. *See e.g., U.S. Bank. v. Richards,* 189 Ohio App.3d 276, 938 N.E.2d 74, 77 (Ohio Ct.App.2010) (holding the real party in interest in foreclosure actions is the current holder of the note and mortgage and the failure to prove who is the real party in interest creates a genuine issue of material fact precluding summary judgment); *Buford v. Palisades Collection, LLC,* 552 F.Supp.2d 800, 809 (N.D.Ill.2008) (holding that, in a FDCPA case where the debt collector did not provide the court with the assignment or

purchase contract between the debt collector and AT&T, the debt collector had not shown that it acquired all rights under the agreement).

It is well-established a party may introduce evidence that would otherwise be barred as hearsay if that evidence qualifies as a "business record" under the Federal Rules of Evidence, section 803(6).[1] Moreover, Plaintiff herein recognizes that, in some circumstances a party may fulfill the requirements of 803(6) by incorporating the business records of another.

A key question to resolve, however, in determining whether records are admissible under 803(6), is whether the "records have sufficient indicia of trustworthiness to be considered reliable." *Saks Int'l, Inc. v. M/V Exp. Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987). Trustworthiness of a record, or the lack thereof, can be established by: a) demonstrating the inherent reliability of the record itself; [2] or b) by demonstrating that the person introducing the record can show familiarity "with the record-keeping system of the business in question and [knows] how the records were created". *Kasper Global Collection & Brokers, Inc. v. Global Cabinets & Furniture Mfrs. Inc.,* 10 CIV. 5715 DF, 2013 WL 3388427 (S.D.N.Y. July 1, 2013), quoting *Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence Manual,* § 16.07(2)(c) (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.) (2012). Incorporated business records that merely echo those of another "without some indicia of trustworthiness, cannot constitute 'regular business activity' that is admissible

---

[1] See *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1119 (S.D.N.Y. 1993) aff'd, 32 F.3d 690 (2d Cir. 1994) ("the relevant portion of Rule 803(6) provides: the following are not excluded by the hearsay rule, even though the declarant is available as a witness: **(6) Records of regularly conducted activity**. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness").

[2] "The court must be able to determine from some appropriate source—from the document itself, or from external evidence (either direct or circumstantial or both), or from some combination of these things—that the foundational element has been met." *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1119 (S.D.N.Y. 1993) aff'd, 32 F.3d 690 (2d Cir. 1994), quoting, *White Indus., Inc. v. Cessna Aircraft Co.,* 611 F.Supp. 1049, 1060 (W.D.Mo.1985).

under Rule 803(6)." *Ortho Pharm. Corp.* at 1120-21. Indeed, "to hold otherwise would invite unscrupulous companies to analyze unfavorable data in a disingenuous way as part of their 'regularly conducted business activity,' thereby obtaining enormous advantages in future litigation". Id. at 1120.

In *Ortho*, a pharmaceutical company attempted to introduce into evidence a series of "market surveys." *Id.* at 1118. The surveys were developed and created by the pharmaceutical company's in-house "market research department," which in turn had hired "independent contractors". *Id.* at 1119. At trial, the company tried to introduce the "market surveys" through the testimony of one of their employees. However, the court held that the surveys were inadmissible hearsay because: the testifying witness's knowledge of the surveys derived only from having been "briefed on its contents by his boss" an addressee "of the report;" and the testifying witness did not "appear on the face of the document as one of the Ortho employees to whom a courtesy copy was sent," nor did the witness "commission the work" or "play any role in its preparation." *Id*. Under these circumstances, the court found that the company's witness was not a "person of knowledge," but also that the entire "trustworthiness" of the documents was "unclear because of the foundation that was laid." *Id*.

In *Webb v. Midland Credit Mgmt., Inc.*, Midland attempted to prove that they were an assignee of a consumer debt and so could enforce an arbitration clause. 11 C 5111 at 1, 2012 WL 2022013 (N.D. Ill. May 31, 2012). In support of its position, the Midland Defendants submitted the declaration of "Pat Minford, Senior Manager of Business Development Process for Midland Credit, who, based on his personal knowledge and review of the business records of Midland Funding and Midland Credit," stated that "Citibank South Dakota, N.A" had assigned its interest in the consumer's account. *Id*. In the current case, Midland again bases their assertion that they are

entitled to enforce the bank's arbitration agreement on the declarations of "Michael Burger, Director, Legal Collections Operations, for Midland Credit Management, Inc." The *Webb* court held, as this Court should too, that that Minford lacked "personal knowledge of the procedure used to create and maintain" the documents he wished to introduce into evidence and that he was "not capable of testifying as a qualified witness". *Id*. at 5.

In this case as well, Michael Burger's Declaration does not qualify for the business records exception because the declaration was not drafted as part of a regular business activity, but specifically for this lawsuit, that is, to seek to compel Plaintiff's claim to arbitration. "Documents prepared specifically for the subject litigation are 'properly excluded because of motivational concerns arising from the fact that they were generated for litigation purposes,' as opposed to records generated for business purposes." *LVNV Funding, LLC v. Mastaw*, M2011-00990-COA-R3CV, 2012 WL 1534785 (Tenn. Ct. App. Apr. 30, 2012) (quoting 2 Kenneth S. Broun, McCormick on Evidence § 288 (6th ed.2009)).[3]

Burger is certainly free to offer evidence that is based on his personal knowledge. However, if he is seeking to lay the predicate for the introduction of documents as a business record (particularly business records of a different company) or basing his testimony on the contents of those documents, then that is simply rank hearsay attempting to be slipped in through the business records exception.

Burger is not employed by the Seller of the accounts he seeks to authenticate, rather, he is an employee of a third party, which was not a party to the transaction, Midland Credit Management. MCM was given certain data on these accounts for one purpose and one purpose

---

[3] In the case at bar, the affidavits executed by Griffin were clearly prepared specifically for the instant litigation, to trace the assignments of Mastaw's debt, establish LVNV's ownership of the debt and the amount due from Mastaw. They do not incorporate by reference or otherwise summarize or interpret documents that are prepared in the normal course of regularly conducted business activity.  *Id*.

only: to collect on these accounts, through litigation if necessary. If the fact that MCM incorporated these third party records into its own records for collection purposes makes them admissible on Burger's say-so as an exception to the hearsay rule, then so too could an attorney who is collecting for a creditor client be able to submit his own declaration to authenticate the client's records as incorporated into his office records. Yet in both cases, the declaration lacks indicia of trustworthiness. *See Hinkle v. Midland Credit Mgmt., Inc.*, 26 Fla. L. Weekly Fed. C 483 n.3 (U.S. 11th Cir. 2016) (Stating that "the lack of account-level documentation can prevent debt buyers from litigating disputed debts on the merits." and quoting a case against Midland where the court issued an order "denying a motion to compel arbitration because [Midland] failed to demonstrate that "a valid agreement to arbitrate exists" and "submitted only a generic cardmember agreement from Chase Bank" that was "unsigned".")

In *Henggeler v. Brumbaugh & Quandahl, P.C.,* 894 F. Supp. 2d 1180, 1187-88 (D. Neb. 2012) as mentioned above the court found these exact problems with defendant Midlands attempt to compel arbitration. The court stated:

> "The court finds Midland has not shown that a valid agreement to arbitrate exists. Midland has submitted only a generic cardmember agreement from [the bank]. The agreement is unsigned and Midland has failed to provide evidence that [plaintiff] was a party to the agreement.[plaintiff] has stated she has not seen the agreement ...  On this record, the court finds there is a failure of proof with respect to a valid arbitration agreement. The court has not been provided with any signed credit card application, credit card agreement or with the affidavit of any person with personal knowledge that [plaintiff] had signed such an agreement. [The banks employee's] affidavit shows on its face that it is not based on first-hand knowledge. She states no more than that she has access to records made by, or made from, information transmitted by a person with first-hand knowledge. The evidence outlining [The bank's employee's] responsibilities ("her title was CCS Vendor Portfolio Liaison . . .") is meaningless without some definition of the meaning of those terms or explanation of the functions of that job. She states only that a cardmember agreement was provided to  [plaintiff], but there is no evidence that [plaintiff] received it, reviewed it, or agreed to it... Furthermore, Midland has not shown that it has a valid assignment of the purported debt, if valid, from [the bank]. The documentary evidence of the sale is incomplete. There is nothing that shows [plaintiff's] purported account was one of the [the banks] accounts sold to Midland. The "data file" referred to in the bill of sale was not provided to the court. Further, the sales agreement itself, though referenced in the bill of sale, was not attached and the one-page "closing statement" was extensively redacted. The affidavits on which Midland relies are not based on personal knowledge, contain hearsay and lack foundation."

In this case, Midland has not shown that a valid agreement to arbitrate exists. Midland has not summited the original agreement signed in 2003, rather Midland has submitted only an incorrect generic undated cardmember agreement, which shows the wrong Credit Card as well as the wrong party.

In addition to being the wrong agreement, (Reich Aff p.2,) this unsubstantiated agreement 1) was never sent, 2) it is admittedly unsigned, and 3) Midland has failed to provide evidence that Reich was a party to the agreement.  Reich has stated she has never seen the agreement. *Id*.

This Court has not been provided with any signed credit card application, credit card agreement or with the affidavit of any person with personal knowledge that Reich had signed or received such an agreement.

Ms. Nayman's affidavit shows on its face that it is not based on first-hand knowledge. She states no more than that she has access to records made by, or made from, information transmitted by a person with first-hand knowledge. The evidence outlining Ms. Nayman's responsibilities her title as lead litigation analyst is meaningless without some definition of the meaning of those terms or explanation of the functions of that job. She states only that a cardmember agreement was provided to Reich in June 2012, but there is no date when it was sent there is no evidence at all showing that it may have been sent. There is no date in Midland's or Synchrony's records as to when the agreement was sent. **This is an incurable failure of proof with respect to a valid arbitration agreement.**

Midlands's entire motion to compel is based on this change in terms that was supposedly sent in June 2012. Midland's memo of law (at p 3-5) is entirely premised on this new agreement that was purportedly sent in June 2012.  In fact, Midland devotes three full pages to reproduce these terms and conditions; however, Ms. Nayman in her affidavit, does **not** state that <u>the records</u>

show or indicate "A change in terms for the account was also sent" rather she conjects with a bare conclusory statement that.  "A change in terms for the Account was also sent to this address in June 2012 and is attached herto as Exhibit B."  Additionally, Ms. Nayman does not even state that "a true and correct copy" of the Terms & Conditions are attached she just plainly speculates that "A change in terms for the Account was also sent to this address in June 2012 and is attached herto as Exhibit B."

The only evidence provided was a vague statement that it was sent in June 2012.  There is no evidence nor are there any records that it was in fact sent.  Furthermore, the bank admits it does not have the date it was sent. The bank admits that it cannot testify that that Reich received it, reviewed it, or agreed to it.  In fact, Reich denies this in the most unequivocal terms. Reich Aff p.1-5

 Most importantly the Copy provided by Midland on its face shows that it is the wrong agreement which could not bind Reich. Midland cannot contest Reich's affidavit since it does not have any firsthand knowledge of any of the agreements made with the bank.

Midland has not produced any contract between Plaintiff and the bank nor any other admissible and probative evidence to establish that Plaintiff entered into binding agreements to arbitrate with the bank. *See Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 694-95 (S.D.N.Y. 2015)

> "In other words, [the original creditors employee] declaration does nothing to cure Defendants' primary evidentiary deficiency on this motion: Defendants have still not produced any contracts between any Plaintiff and [the original creditor] or any other admissible and probative evidence to establish that these Plaintiffs entered into binding agreements to arbitrate with [the original creditor].The Second Circuit has declined to compel arbitration where the moving party submitted far more compelling evidence of an agreement to arbitrate than Defendants have submitted here. In *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 371-72 (2d Cir. 2003), the Second Circuit denied the motion to compel arbitration where both parties signed documents agreeing to arbitration but never signed the same

document containing a complete list of agreed upon arbitration procedures. Similarly, in *Dreyfuss v. eTelecare Global Solutions-U.S. Inc.*, 349 F. App'x 551 (2d Cir. 2009), the party seeking arbitration produced a copy of the first and last page of a signed arbitration agreement but was unable to produce the pages in between. Id. at 552-53. Despite evidence that both parties manifested an intention to arbitrate, the Second Circuit held that, "even if a contract did exist in this case, the agreement is not enforceable because . . . the party seeking enforcement . . . has failed to prove its terms." Id. at 555. Here, Defendants submit only sample agreements of non-parties; they have not produced a single word of a contract between any Plaintiff and [the original creditor]. Moreover, the sample arbitration agreements are not identical, and Defendants have not proved or even identified which set of terms applies to any Plaintiff ... Even if Defendants had demonstrated that Plaintiffs' alleged agreements to arbitrate existed, such agreements would be unenforceable because Defendants have failed to prove their terms. The Court will not compel Plaintiffs to arbitrate this dispute based on the sample agreements of non-parties." Arbitration is a matter of consent, not coercion." Defendants have not met their burden to establish that a binding arbitration agreement was made between any of the Plaintiffs and [the original creditor]." (Citations omitted)

Furthermore, Midland has not shown that it has a valid assignment of the purported debt, if valid, from the bank. The documentary evidence of the sale is incomplete. There is nothing that shows Reich's purported account was one of the Synchrony accounts sold to Midland. The "notification files" referred to in the bill of sale were not provided. The Bottom of the "data file" admits that it was produced specifically for this lawsuit and it contains contradictory dates.

Further, the sales agreement itself, though referenced in the bill of sale, was not attached and there was no "closing statement." The dates for the sale of Reich's purported account are all conflicting, and the affidavit of sale of account by the original creditor is meaningless as it states nothing with regard to Reich's account. The affidavits on which Midland relies are riddled with evidentiary deficiencies, are not based on personal knowledge, contain hearsay and lack foundation.

**C.    <u>Defendant admits they cannot testify when the agreement was sent.</u>**

Midland's motion to compel arbitration is entirely based on one vague sentence in an affidavit which claims that "[a] change in terms for the account was also sent to this address in

June of 2012." Most importantly Midland claims that this "change in the terms" contains "a broad arbitration clause in the Terms & Conditions" which is the agreement in this case that mandates arbitration.

Specifically the Affidavit of Angel Nayman contains one sentence which states as follows: "A change in terms for the account was also send to this address in June 2012 and is attached hereto as Exhibit B."

Midland bases its entire claim that they are entitled to arbitration, on this bare unsubstantiated statement that "a change in terms was sent in June 2012. and is attached hereto as Exhibit B."

Midland does not claim they entered into an agreement with Lea Reich neither does Midland claim that they sent this supposed "change in terms for the account ... in June 2012."

Midland somehow thinks that this bare statement - that does not contain a date - can qualify Midland to meet their *initial* showing that an agreement to arbitrate with Midland existed.

Midland admits that they cannot testify to a date when "the broad arbitration clause in the Terms & Conditions" was supposedly sent. (Affidavit of Angel Nayman p.2 & Defendants Memo of law at p.3)  Indeed, Midland has offered *literally no evidence* even purporting to describe the manner in which Plaintiff supposedly was notified of, or agreed to, any arbitration provision. The Second Circuit has repeatedly held that parties cannot be bound to arbitrate absent an initial evidentiary showing by the movant of notification and knowing acceptance. Where a party seeking to compel arbitration fails to prove that a consumer was put on notice of an arbitration term and then manifested assent to it, the motion to compel must be denied. *Hines*, 380 F. App'x at 24; *see also Schnabel v. Trilegiant*, 697 F.3d 110, 118 (2d Cir. 2012) (affirming denial of motion to compel for failure to prove plaintiff received notice of arbitration provision)

In addition, Midland with this bare statement, sets out to prove that - despite the fact that they admit to not knowing the date when this change in terms was sent- not only was this agreement sent to Reich, Midland contends that Reich received this agreement and that the she assented to its terms.  Strikingly and comically, Midland asserts this undated incorrect agreement **is** the agreement that proves that Reich agreed to arbitration with Midland in this case. *See Yates v. CACV of Colo., LLC,* 303 Ga. App. 425, 693 S.E.2d 629 (2010) (holding that movant failed to prove existence of valid arbitration agreement when "[movant] did not submit a copy of any credit card application or agreement executed by [cardholder]; nor did it submit an affidavit or other evidence showing the date [cardholder] entered into a credit agreement with [the Bank] and that the photocopied terms and conditions [attached to the motion to compel arbitration] represented the terms and conditions in effect for all[the bank] credit agreements at that time"; and movant also "failed to offer any evidence showing . . . that the amendments [to the credit card application containing the arbitration clause] were sent to [the cardholder]")

This one-liner in Midland's affidavit is bare, unsubstantiated, and it is not credible on its face, in addition to the fact that is entirely false.  This agreement was not sent in June 2012 and Reich never received this agreement in June 2012 nor at any other time prior to seeing the motion to compel. (Reich Aff p.2) The failure to provide the date of the mailing of the putative Cardmember Agreement was another reason that Midland lost a motion to compel arbitration in this class action as well *see. Reimann v. Brachfeld, [Midland Funding, et al]*, 2013 WL 5145784 at * 1-3 (Cal.Super.) (August 2, 2013).

Midland has provided *no date or evidence* that any agreement containing an arbitration clause at issue was mailed to Reich. *See. Kulig v. Midland Funding, LLC,* 2013 U.S. Dist. LEXIS 161960, at *13-14 (S.D.N.Y. Nov. 13, 2013)

"Here, <u>Midland has provided no evidence that any notice of an amendment containing the arbitration clause at issue was mailed to [plaintiff] at any point</u>. Further, Midland concedes that none of the [card] account statements they provided includes any such notice. Cases upholding the existence of a validly executed amendment include affirmative evidence in the record indicating that the requisite notice, which includes an opportunity to opt-out, was sent to the cardholder… Against this legal background, Midland has produced neither the language or <u>date of any notice of amendment pertaining to an arbitration clause, nor any evidence that such notice was mailed to [plaintiff] at any point</u>") (emphasis added)

Midland is seeking to compel arbitration and they "<u>must make a prima facie *initial* showing that an agreement to arbitrate existed *before* the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'</u>" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010). (emphasis added)

Midland has failed to "make a prima facie <u>initial</u> showing that an agreement to arbitrate existed," the motion to compel arbitration must be denied. *Hines*, 380 F. App'x 22, 24

**D.      Defendants have provided no evidence that the initial agreement contained a provision that plaintiff would be subject to change in terms notices mailed to plaintiff.**

Midland has not provided the original agreement from December 21, 2003.  Midland argues that plaintiff was bound by subsequent changes in terms notices mailed to her. However, even if *arguendo* Midland could prove that the change in terms were sent on a specific date and even if the correct change of terms were actually sent, this Court would still not be able to evaluate the change in terms without the initial agreement. Midland has provided no evidence that the initial agreement contained a provision that plaintiff would be subject to change in terms notices. Therefore, plaintiff would not be bound to any change in the supposed terms.

The initial agreement did not contain an arbitration requirement. In addition, there is no evidence or claim that the original agreement contained an arbitration agreement or allowed unilateral amendment by the bank or allowed the bank to add terms by sending plaintiff a notice to which she must respond in order to avoid having the new term added.

Without benefit of the December 21, 2003 initial agreement, this Court cannot discern what clauses were in effect in 2003 such that any mailed notice of change in terms was sufficient to change the initial agreement terms, or to render effective the subsequent notice of change to require mandatory arbitration.

The following is an additional reason why the motion to compel arbitration must fail. Midland has failed to demonstrate that a valid agreement to arbitrate exists. Although the FAA incorporates a strong federal policy of enforcing arbitration agreements, that policy does not arise until an enforceable agreement is established. The instant record does not reflect that plaintiff agreed to mandatory arbitration. See *Gerber v. Citigroup, Inc.,* No. CIV S-07-0785 WBS JFM PS, 2008 U.S. Dist. LEXIS 15594 (E.D. Cal. Feb. 29, 2008) Adopted by, Motion to compel denied by, Stay denied by *Gerber v. Citigroup,* 2008 U.S. Dist. LEXIS 22430 (E.D. Cal., Mar. 20, 2008)

> "No party has provided the original agreement from 1995, nor an exemplar agreement effective in 1995 when plaintiff's credit card was first issued by Universal Bank. While defendant argues that plaintiff was bound by subsequent change in terms notices mailed to him, this court is unable to evaluate the change in terms without benefit of the initial agreement. Defendant has provided no evidence that the initial agreement contained a provision that plaintiff would be subject to change in terms notices mailed to plaintiff. [O]n these facts, plaintiff is not bound to change in terms notices mailed to his home address. Badie v. Bank of America, 67 Cal.App.4th 779, 79 Cal.Rptr.2d 273 (1998) (where initial original agreement was ambiguous as to whether it could be unilaterally amended to include an arbitration clause, bank could not amend the terms of credit card account agreements by adding an arbitration clause, despite provisions in the account agreements authorizing the bank to change terms of the accounts). Here, it is clear the initial agreement did not contain an arbitration requirement or Universal Bank would not have attempted to modify the initial agreement to include the arbitration clause. In addition, there is no evidence that the original agreement allowed unilateral amendment by Universal Bank or allowed Universal to add terms by sending plaintiff a notice to which he must respond in order to avoid having the new term added…[W]ithout benefit of the 1995 initial agreement, the court cannot discern whether these important clauses were in effect in 1995 such that the mailed notice of change in terms was sufficient to change the initial agreement terms, or to render effective the subsequent  notice of change to require mandatory arbitration. Because defendant has failed to demonstrate that plaintiff was bound to change in terms notices mailed to his home address … Citibank has failed to demonstrate that a valid agreement to arbitrate exists. Although the FAA incorporates a strong federal policy of enforcing arbitration agreements, that policy does not arise until an enforceable agreement is established. The instant record does not reflect that plaintiff agreed to mandatory arbitration."

Furthermore, New York law does not allow a bank to unilaterally amend revolving credit agreements. In New York, essential to the formation of a contract amendment is proof of each

element requisite to the formulation of a contract, including mutual assent to its terms. No party can be held to have surrendered or modified any of his contract rights unless she is shown to have assented thereto in a manner that satisfies the requirements of a valid contract. The demonstration of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract.

Although the use of a credit card constitutes acceptance of an offer of credit, merely continuing to owe money on a credit card account cannot reasonably be understood to be an "objective manifestation of intent" that binds the parties to a change in terms. An outstanding balance on a credit card, without more, is simply a debt attributable to past uses of the card rather than a present intention to be continuously bound to all terms imposed at any time.

An unpaid balance on a credit card account, which, without more, is merely a debt attributable to past uses of an account. Midland has failed to come forward with evidence which, if believed, demonstrates that Reich manifested her assent to the terms of the amended Cardmember Agreement, including the arbitration provision. Thus, under the common law principles of New York contract law, Midland has failed to create a genuine issue of material fact as to whether a valid agreement to arbitrate was formed. See *Kulig v. Midland Funding, LLC*, 2013 U.S. Dist. LEXIS 161960, at *16-19 (S.D.N.Y. Nov. 13, 2013)

> "New York law does not provide banks with a statutory right to unilaterally amend revolving credit agreements. In New York, [f]undamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms. No one will be held to have surrendered or modified any of his contract rights unless he is shown to have assented thereto in a manner that satisfies the requirements of a valid contract. The manifestation of expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract. Although the use of a credit card constitutes acceptance of an offer of credit, merely continuing to owe money on a credit card account cannot reasonably be understood to be an "objective manifestation of intent" that binds the parties to a change in terms. An outstanding balance on a credit card, without more, is simply a debt attributable to past uses of the card rather than a use in and of itself. Midland relies on Herrington v. Union Planters Bank, N.A., 113 F. Supp. 2d 1026, 1031 (S.D. Miss. 2000) to argue that Kulig's keeping the account open and maintaining a debt amount to a "use" of the account sufficient to constitute acceptance of the proffered Cardmember Agreement. First, in Herrington, the court explicitly stated that the consumer was mailed a letter along with a copy of the revised agreement containing the arbitration provision. Id. at 1028.

The court rejected plaintiffs' argument that they never assented to the change in terms not merely because they maintained their accounts, but because they did so after it was "undisputed that the plaintiffs were given notice . . . that their accounts were being revised to include an arbitration clause." Id. at 1031. Moreover, the account at issue in Herrington was a deposit account, not a revolving credit account. To maintain a deposit account with a bank is to "use" such an account to store one's assets in a federally insured safe house, to earn interest on the assets, and to have access to the assets through the bank's network. This contrasts with an unpaid balance on a credit card account, which, without more, is merely a debt attributable to past uses of the account. Midland has failed to come forward with evidence which, if believed, demonstrates that Ms. Kulig manifested her assent to the terms of the March 22, 2009 Cardmember Agreement, including the arbitration provision. Thus, under both the common law principles of New York contract law and the applicable statutory provision of Delaware law, Midland has failed to create a genuine issue of material fact as to whether a valid agreement to arbitrate was formed."

**E.    Midland offered no acceptable evidence to demonstrate the existence of a genuine issue of material fact concerning the existence of an arbitration agreement, its motion to compel arbitration must be denied as a matter of law without the need for discovery or trial.**

In *Hines v. Overstock.com*, decided by this very Court, the party moving to compel arbitration failed to meet its initial burden to establish that a binding arbitration agreement was formed. 380 F. App'x at *24. The party sought reconsideration from this court on the basis of additional evidence that it "could have introduced . . . in its initial motion but did not." *Id*. at *25. This Court denied the motion to reconsider, and the Court of Appeals affirmed. *Id.* This Court again should deny Defendants' motion with prejudice, without affording Defendants an opportunity to "offer evidence that, with any amount of due diligence, could have been submitted in support of the original motion." Order, *Hines v. Overstock.com, Inc.*, No. 09 Civ. 991 (E.D.N.Y. Sept. 22, 2009) (Dkt. 13) (Johnson, J.)

The evidence offered by Midland is insufficient to raise a genuine issue of fact as to the existence of an arbitration agreement between its supposed predecessor-in-interest and Reich. As explained above, Midland provides no acceptable evidence that the correct arbitration agreement was ever sent to plaintiff. Nor does Midland provide evidence that the terms it seeks to enforce were part of the right agreement or were contained in the form of any agreement that "was also sent" to Mrs. Reich. At best, Midland's statement that "change in terms" that contained the

arbitration agreement attached to its motion — a change which it concededly has no record of or date when sent — A change in terms for the Account was also sent in June 2012 to plaintiff — is no more than a "mere scintilla of evidence" in support of its position, insufficient to create a genuine dispute of material fact. See *Niagara Mohawk Power Corp. v. Jones Chem.*, 315 F.3d 171 (2d Cir. 2003) *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of fact")

Moreover, entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). See *Bazemore v. Jefferson Capital Sys. LLC,* 26 Fla. L. Weekly Fed. C 462 (U.S. 11th Cir. July 5, 2016)

> "Here, the competent evidence offered by [the debt buyer] is insufficient to raise a genuine issue of fact as to the existence of an arbitration agreement between its predecessor-in-interest and [plaintiff]. As explained above, [the debt buyer] provides no competent evidence that an arbitration agreement ever was sent to plaintiff. Nor does [the debt buyer] provide evidence that the terms it seeks to enforce were contained in the form of any agreement that "would have been sent" to [plaintiff]. At best, [the debt buyers] statement that "a form" of the arbitration agreement attached to its motion — a form of unknown terms of which it concededly has no copy — "would have been sent" to plaintiff is no more than a "mere scintilla of evidence" in support of its position, insufficient to create a genuine dispute of material fact... Moreover, entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. As defendant offered no competent evidence to demonstrate the existence of a genuine issue of material fact concerning the existence of an arbitration agreement, its motion to compel arbitration must be denied as a matter of law without the need for a trial." (citations omitted)

The party seeking to compel arbitration "must make a prima facie *initial* showing that an agreement to arbitrate existed *before* the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines*, 380 F. App'x 22, 24

*Only* once the party seeking to compel arbitration has made an *initial* prima facie showing that an agreement exists, does the party seeking to avoid arbitration bear the burden of showing the agreement is inapplicable or invalid.

Despite the fact that Midland failed to meet its initial burden of making an initial prima facie showing that an agreement to arbitrate existed, and despite the fact that due to Midland's initial failure to show an existent agreement, the burden in this case did *not* shift to plaintiff to make a showing that any agreement is inapplicable or invalid; nevertheless, plaintiff has extensively shown that no applicable or valid agreement to arbitrate could exit.

Midland offered no acceptable evidence to demonstrate the existence of a genuine issue of material fact concerning the existence of an arbitration agreement, its motion to compel arbitration must be denied as a matter of law without the need for discovery or trial.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion should be denied.

Dated: Cedarhurst, New York
August 1, 2016

ADAM J. FISHBEIN, P.C.

By:   /s/ Adam J. Fishbein
Adam J. Fishbein, P.C. (AF-9508)
**Attorney at Law**
483 Chestnut Street
Cedarhurst, New York 11516
Telephone: (516) 791-4400
Facsimile: (516) 791-4411

Attorney for Plaintiff