UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LEA REICH, on behalf of herself and all
others similarly situated,

                Plaintiff,

       -against-

MIDLAND CREDIT MANAGEMENT,
INC., MIDLAND FUNDING, LLC, and
ENCORE CAPITAL GROUP, INC.,

             Defendants.

Civil Action No:

1:15-cv-07195-JG-RML

---

## REPLY IN SUPPORT OF DEFENDANTS'
## MOTION TO COMPEL ARBITRATION

---

Joseph A. Hess (JH1964)
Marshall Dennehey Warner
Coleman & Goggin
*Attorneys for Defendants,*
*Midland Credit Management, Inc.,*
*Midland Funding, LLC and*
*Encore Capital Group, Inc.*
Wall Street Plaza
88 Pine Street, 21st Floor
New York, New York 10005
T: (212) 376-6438
F: (212) 376-6490
JAHess@mdwcg.com

0

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     CLARIFICATION OF THE FACTS AT ISSUE ..................................... 2

    A.   Plaintiff's Account Was With Gap, Inc. - The Owner of Banana Republic at All Relevant Times. ..................................................................................... 2

    B.   Plaintiff's Account Was Always Subject to a Broad Arbitration Agreement. ................. 2

    C.   Plaintiff Never Had an Account Ending In 4112, Or She is Mistakenly Referring to a Separate Account. ................................................................................... 4

    D.   Plaintiff Assented to the Terms And Conditions, Including the Arbitration Agreement. 5

    E.   Plaintiff Waived the Right to Pursue a Class Action or to Act as Class Representative. 6

III.    ARGUMENT .............................................................................................. 7

    A.   Defendants Have Met Their Burden Of Establishing Plaintiff's Assent to the Valid Arbitration Agreement. .............................................................................. 7

    B.   Defendants Have Submitted Competence Evidence in Support of Their Motion. .......... 9

IV.     CONCLUSION ........................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*Abascal v. Fleckenstein*, 820 F.3d 561 (2d Cir. 2016).................................................... 9

*Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011) ........................ 9

*Bayway Ref. Co. v. Oxygenated Mktg. & Trading*, 215 F.3d 219 (2d Cir. 2000)........................... 1

*Dzanoucakis v. Chase Manhattan Bank, USA*, 2009 U.S. Dist. LEXIS 27299, 2009 WL 910691 (E.D.N.Y. Mar. 31, 2009) ................................................................................... 8, 9

*Guadagni v. New York City Transit Authority*, 387 F. App'x 124 (2d Cir. 2010) ........................ 1

*Hagner v. United States*, 285 U.S. 427 52 S. Ct. 417, 76 L. Ed. 861 (1932) ................................ 7

*Ms. Interpret v. Rawe Druck-und-Veredlungs-GmbH (In re Ms. Interpret)*, 222 B.R. 409 (Bankr. S.D.N.Y. 1998) .................................................................................................. 8

*Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249 (2d Cir. 2005) ................................................. 1

## I.    <u>INTRODUCTION</u>

In her Response in Opposition to Defendants' Memorandum in Support of Motion to Compel Arbitration ("Pl's Opp.") and Plaintiff's Affidavit in support of Plaintiff's Opposition ("Pl's Aff."), Plaintiff calls into question the accuracy and veracity of Angel Nayman's affidavit on behalf of Synchrony Bank in Support of Defendants' Motion to Compel Arbitration (the "Synchrony Aff."). Pl's Opp. at pp. 1-2, 22-24; Pl's Aff. at ¶¶ 17, 23-25, 28, 29, 32 and 33. In response, Defendants Midland Credit Management, Inc., Midland Funding, LLC and Encore Capital Group ("Defendants") submit contemporaneously herewith the Supplemental Affidavit of Angel Nayman in Support of Midland's Motion to Compel Arbitration ("Synch. Supp. Aff.")

Submission of the supplemental affidavit and supporting documents is necessary and proper because Plaintiff's opposition and affidavit raise factual and legal issues for the first time, making unsupported allegations inconsistent with Synchrony's statement and business records, and alleging a nefarious plot by Defendants and Synchrony, which Defendants could not anticipate in their opening brief. Pl's Opp. at pp. 1-6; Pl's Aff. at ¶¶ 25, 28 and 39. It is axiomatic that reply affidavits with evidentiary exhibits are proper under such circumstances. The Second Circuit has stated, "reply papers may properly address new material issues raised in opposition papers so as to avoid giving unfair advantage to the answering party." *Bayway Ref. Co. v. Oxygenated Mktg. & Trading*, 215 F.3d 219, 226-27 (2d Cir. 2000). *See also Guadagni v. New York City Transit Authority*, 387 F. App'x 124, 125-26 (2d Cir. 2010); *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) (noting it was within district court 's discretion to consider arguments made for first time in reply brief on summary judgment motion). Therefore, Defendants' submission of the Supplemental Synchrony Affidavit is not only necessary due to Plaintiff's vexations allegations in her opposition, but is proper under all controlling precedent.

## II.     CLARIFICATION OF THE FACTS AT ISSUE

Crucial facts set forth in Plaintiff's Affidavit and Opposition are erroneous as established by Synchrony's records and public documents.   It is telling that Plaintiff does not submit one invoice, statement or other objective document to support her factual allegations. Yet, she remembers details going back to 2003 with extraordinary detail.   Pl's Aff. at ¶¶ 35 and 36. Plaintiff's recollections are wrong with respect to, at the very least, the following material facts.

### A.     Plaintiff's Account Was With Gap, Inc. - The Owner of Banana Republic at All Relevant Times.

Plaintiff's claim that she never had an agreement with Gap, Inc. is incorrect.  Pl's Aff. at ¶¶ 26-33.  It is a matter of public record, of which the Court may take judicial notice, that Gap, Inc. bought Banana Republic in 1983 and continues to own the company.  See Gap, Inc. 10K – Annual Report for the fiscal year ending 2015, annexed hereto as Appendix 1, at p. 8.[1]  Also, the original credit card agreement between Plaintiff and Banana Republic informed Plaintiff that Gap, Inc. was a party to the agreement.   See credit card agreement dated April 1, 2003 (the "Original Agreement"), annexed to the Supplemental Synchrony Aff. as Exhibit B thereto, at p. 8 ("As solely used in this Arbitration provision, the terms 'we' and 'us' shall for all purposes mean Monogram Credit Card Bank of Georgia, **Gap, Inc.** and all their respective parents, . . . subsidiaries, affiliates, predecessors, successors, **assigns**, employees, officers and directors.") (Emphasis added). Thus, Plaintiff's Account[2] was with Gap, Inc. at all relevant times.

### B.     Plaintiff's Account Was Always Subject to a Broad Arbitration Agreement.

Plaintiff's contention that she never received the terms and conditions and that her Agreement was never subject to an arbitration agreement is incorrect.  In 2003, the Original

---

[1] This document was downloaded from the Securities and Exchange Commission's official website on August 18, 2016, as indicated on the document footer. Only the first 8 pages have been provided for brevity.

[2] All capitalized terms not defined herein are intended to have the meaning ascribed to them in the Memorandum of Law in Support of Defendants' Motion to Compel Arbitration.

Agreement was sent to Plaintiff at her address.  Synch. Supp. Aff. at ¶ 4 and Ex. B. It contained a

broad arbitration agreement substantially similar to the provision cited in Defendants' principal

brief.  *Id.* at Ex. B, p. 8, ¶ 18. The Original Agreement states:

> **18. ARBITRATION PROVISION**. This Arbitration Provision sets forth the
> circumstances and procedures under which a Claim or Claims (as defined below)
> may be arbitrated instead of litigated in court. This Arbitration Provision supersedes
> and replaces any existing arbitration provision between you and us. . . . As used in
> this Arbitration Provision, **the term 'Claim' or 'Claims' means any claim, dispute
> or controversy between you and us arising from or relating to this Cardholder
> Agreement** (the 'Agreement'), any prior agreement that you may have had with us **or
> the relationships resulting from the Agreement** . . . **'Claim' or 'Claims' includes
> claims of every kind and nature, between you and us, including** . . . claims based
> upon . . . **statute**, regulation [etc.]. **The term 'Claim' or 'Claims' is to be given the
> broadest possible meaning** and includes, by way of example and without limitation,
> any claim, dispute or controversy between you and us that arises from or relates to
> (a) the credit card account ('Account') created by the Agreement or any prior
> agreement, or any balances on the Account, (b) the goods or services (including
> insurance or extended service contracts, if any) charged to the Account, (c)
> advertisements, promotions or oral or written statements related to the Account,
> goods or services financed under the Account or the terms of financing, (d) your
> application for the Account and (e) the origination or servicing of the Account or any
> prior agreement and the **collection of amounts owed** by you to us.

(emphasis added, except title). Per the Original Agreement, Plaintiff became bound by its terms

upon approval of Plaintiff's application for the Account.  *Id.* at p. 1, ¶ 2.  The Original Agreement

reserved the right for the issuer "at any time" to "change or delete any term or condition of, or

add new terms to, th[e] Agreement relating to [Plaintiff's] Account."  *Id.* at p. 4, ¶ 10.

In addition to the changes in terms sent to Plaintiff in March, 2008[3], and June, 2012,

discussed in Defendants' principal brief, changes in terms were sent to Plaintiff on August 25,

2004, and October 25, 2006. *Id.* at 5 and Ex. C. Those terms and conditions, as with all other

terms and conditions, contain a broad arbitration provision in substantially the same form. *Id.* at

Ex. C, June 2004 Terms & Conditions (the "2004 T&Cs") at pp. 2-3; October 2006 Terms &

---

[3] Defendants contend the agreement sent March 10, 2008, was the contract at issue because it is the principal
agreement with respect to the Account ending in 8020.  As Plaintiff contends there is a single contract whose terms
must be traced back to inception, Defendants provide that analysis on reply.

Conditions ("2006 T&Cs") at pp. 3-5.  These amendments did not change the other principal terms contained in the Original Agreement – the reservation of the right to change terms at any time, and the ability to assign all rights under the contract without approval. *Id.* at Ex. C.

These documents establish that Plaintiff was bound to a broad arbitration agreement from the inception of her Account.  The relevant provisions of the Terms & Conditions – a broad arbitration clause, a reservation of the right to change the terms and to assign Synchrony's rights under the Agreement – were never altered.  Thus, Plaintiff's claims are subject to mandatory arbitration at Defendants' request.

C. **Plaintiff Never Had an Account Ending In 4112, Or She is Mistakenly Referring to a Separate Account.**

Plaintiff asserts that when her Banana Republic rewards account was converted to a VISA account, she received a card with an account number ending in 4112.  Pl's Aff. at ¶ 10. She claims her account number remained the same until she requested a new card due to a fraudulent charge on the account in July, 2008.  *Id.* at ¶ 15.  Plaintiff's assertions are refuted by Synchrony's documentary evidence.

Attached to the Synchrony Supplemental Affidavit is Plaintiff's Account statement for June, 2008 because it shows activity as late as June 25, 2008.  Synch. Supp. Aff. at Ex. D. This statement shows a previous balance of 0 and a balance transfer on May 30, 2008, of $890.87. The description field for the balance transfer shows a credit card number ending in 1177.  The due date on the statement is July 20, 2008 and it shows application of a finance charge on June 25, 2008.  Thus, this statement must have been mailed in late June, 2008.  This statement establishes that the account number changed from 1177 directly to 8020, which dispels Plaintiff's claim that there was an interim card. Also, the statement shows a payment by phone on June 19,

4

2008.  The account number would be verified on the call prior to accepting payment.  Thus, it is apparent Plaintiff did not have a card related to the Account at issue ending in the digits, 4112.

This statement also calls into question Plaintiff's claim that she noticed a fraudulent charge in July, 2008, and requested a replacement card.  The 8020 card is the last card, and it existed in June 2008.  If she noticed a fraudulent charge in July and requested a new card, there would be a subsequent card with a different number.  There is not.  Thus, in her statement Plaintiff is likely recalling a different account then the one at issue.  Such would explain several inconsistencies between Plaintiff's recollections and Synchrony's documents.

**D.    Plaintiff Assented to the Terms And Conditions, Including the Arbitration Agreement.**

Plaintiff's claim that she never received any terms or conditions related to her Account is not credible.  Synchrony's records show that terms and conditions were continually sent to Plaintiff's address of record, as is the custom in the credit industry.  Synchrony Aff. at ¶ 6; Synch. Supp. Aff. at ¶¶ 4-5.  Similarly, Plaintiff 's statement that the Original Agreement did not contain an arbitration agreement or a statement that terms could be changed unilaterally by the card issuer is contradicted by the Original Agreement.  Synch. Supp. Aff., Ex. B at p. 4, ¶ 10 ("Termination/Change in Terms") and p. 6, ¶ 18 ("Arbitration Provision").

Plaintiff asserts the Terms & Conditions are not valid because they do not contain her specific account number.  Plaintiff's assertion in this regard is irrelevant.  As is also customary in the credit card industry, as established by the Synchrony Affidavits, all similar accounts receive the same terms and conditions and changes thereto over time.[4]  They are a form that is mailed or presented with the card.  In this case, the Original Agreement stated that the terms of the agreement became effective upon the approval of Plaintiff's application for the card or use of that

---

[4] The effective date for each set of terms and conditions is noted at the top of the document (e.g., 6/02 means June, 2002, 10/06 means October 2006, etc.)

card.  Original Agreement at p. 1, ¶ 1.  There is no doubt that Plaintiff applied for the Account, and there is no doubt that she used the Account.  Synch. Supp. Aff. at ¶ 8 and Ex. D.  Therefore, she accepted the terms of the Original Agreement, which not only contains an arbitration agreement, but also contains an express reservation to change terms at any time and to assign the contract.  Original Agreement at pp. 6-8, ¶ 18 and p. 8, ¶ 20.

Every amendment to the Terms & Conditions either contained, or did not amend, the broad arbitration agreement, change in terms reservation and assignment clause.  Synch. Supp. Aff. at Ex. C, 2004 T&Cs, pp. 1-3 ("Arbitration"); *Id.*, 2006 T&Cs, pp. 3-5 ("Arbitration")[5]; Synch. Aff. at Ex. A – p. 9, ¶ 11 (change in terms), p. 11, ¶ 19 (arbitration) and p. 13, ¶ 21 (assignment); *Id.* at Ex. B – p. 3 ("Changes to this Agreement"), p. 4 ("Assignment") and p. 5 ("Resolving a Dispute With Arbitration").  Thus, the various permutations of the Agreement are of no moment because the essential terms requiring arbitration of Plaintiff's claims was always part of the contract.  Plaintiff continually assented to the Terms & Conditions by using her Account at various times from 2003 through 2007, and as late as 2013.  Synch. Supp. Aff. at ¶ 8 and Ex. D; Affidavit of Michael Burger in Support of Midland's Motion to Compel ("MCM Aff.") at ¶ 10, Ex. 3.  Plaintiff does not dispute that she had an agreement relating to her Account.  Pl's Aff. at ¶ 36.  She is simply incorrect as to what terms were in that agreement.

### E.    Plaintiff Waived the Right to Pursue a Class Action or to Act as Class Representative.

The Original Agreement contained a class action waiver in anticipation of individual arbitration of any claims related to the Account.  Synch. Supp. Aff. at Ex. B, p. 7.  This limitation continued as a term of the Agreement thereafter.  Synch. Supp. Aff. at Ex. C, 2004 Terms & Conditions at p. 2 ("Important Limitations and Restrictions"); *Id.*, 2006 Terms &

---

[5] Only finance charge and arbitration provisions were amended by the 2004 and 2006 terms and conditions.

Conditions at p. 5 ("Important Limitations and Restrictions"); Synchrony Aff. at Ex. A – p. 12; *Id.* at Ex. B – p. 5 ("No Class Actions"). Thus, the Court should direct Plaintiff to bring her claims in individual arbitration.

## III.   ARGUMENT

### A.   Defendants Have Met Their Burden Of Establishing Plaintiff's Assent to the Valid Arbitration Agreement.

Plaintiff claims the Original Agreement did not contain an arbitration agreement and that she never received any amendments to the Original Agreement. Pl's Aff. at 11, 14, 17, 23, 25, 29 and 33. Plaintiff's contention in the first instance is refuted by the Original Agreement submitted with Synchrony's Supplemental Affidavit. Plaintiff admits her assent to the Original Agreement. Pl's Aff. at ¶ 34. Synchrony's business records show that this contract was sent to her Account address of record. Synch. Supp. Aff. at ¶ 4. It is presumed that a properly mailed document is received by the addressee. *See Hagner v. United States*, 285 U.S. 427, 430, 52 S. Ct. 417, 76 L. Ed. 861 (1932) ("[t]he rule is well settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed"). Accordingly, Plaintiff agreed to all of the terms in the Original Agreement, including the arbitration provisions.

Regarding the amendments, Synchrony's records show the new VISA card agreement and all amended terms were sent to her address of record. Thus, she is presumed to have received them as well. *Id.* Therefore, Defendants have put forth overwhelming evidence that: (1) the original agreement between the parties included an arbitration clause with class waiver, allowing the terms to be amended at will, and at all times allowing all rights under the Agreement to be assigned; (2) each change in terms also contained the same salient terms, which Plaintiff is presumed to have received; and (3) plaintiff never objected to the arbitration provision and

continued to use her credit card after that time. Synchrony Aff. at ¶7; Synch. Supp. Aff. at ¶¶ 6, 8 and Ex. D; MCM Aff. at ¶ 10.  This uncontroverted evidence is sufficient to establish the existence of an arbitration agreement unless Plaintiff comes forward with evidence to effectively counter it.  *Dzanoucakis v. Chase Manhattan Bank, USA*, 2009 U.S. Dist. LEXIS 27299, *21-24, 2009 WL 910691 (E.D.N.Y. Mar. 31, 2009).

In response, Plaintiff has put forth only a self-serving declaration, stating that the Original Agreement did not contain the terms proffered by Defendants, and that she never received the changes in terms.  Pl's Aff. at ¶¶ 17 and 23. She does not provide one document to support her contentions.  It is axiomatic that "a party must do more than merely assert that it did not receive the mailing; its testimony or affidavit of non-receipt is insufficient, standing alone, to rebut the presumption [of receipt]." *Ms. Interpret v. Rawe Druck-und-Veredlungs-GmbH (In re Ms. Interpret)*, 222 B.R. 409, 413 (Bankr. S.D.N.Y. 1998). Accordingly, the Original Agreement and all subsequent amendments thereto are presumed to have reached Plaintiff.  *Dzanoucakis v. Chase Manhattan Bank, USA*, 2009 U.S. Dist. LEXIS 27299 at *23.

The instant matter is on all fours with this Court's decision in *Dzanoucakis*.  In that case, a woman also claimed her credit agreement did not contain an arbitration clause nor a right to alter terms, and that she never received mailed term changes.  The defendant submitted affidavit evidence from an audit manager of the credit card issuer, along with computer business records relating to the plaintiff's account, which showed terms changes had been sent to her account address three times in a two and one-half year period.  In response, the plaintiff submitted only a self-serving affidavit.  Under such circumstances, this Court held:

> [T]the uncontroverted record clearly supports a finding that the parties' agreement allowed for amendments, that a notice of amendment providing for arbitration was sent to plaintiff, and that plaintiff did not object to that notice. Plaintiff's own self-

> serving declaration to the contrary is insufficient, under the circumstances, to raise a triable issue of fact as to the making of the agreement for arbitration.

*Id.* at * 24.   Plaintiff's unsupported statement being of no moment, Defendants' submitted evidence stands uncontroverted.  There is no requirement to show a signed document, as urged by Plaintiff.  Plaintiff accepted the Original Agreement and all subsequent term changes by opening and continuing to use her Account.  She is bound by her cardholder agreement to arbitrate all claims relating to her Account, including those asserted herein.

### B.   Defendants Have Submitted Competence Evidence in Support of Their Motion.

Contrary to Plaintiff's protestations, Defendants have demonstrated the trustworthiness and reliability of their business records, and they are admissible under the business records exception to the hearsay rule.  In order to qualify as evidence under this exception, Defendants were required to show: (a) the records were made at or near the time of the business activity by – or from information transmitted by – someone with knowledge; (b) the record was kept in the course of a regularly conducted activity; (c) making the record was a regular practice of that activity; (d) the custodian certifies the record; and (e) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. *Abascal v. Fleckenstein*, 820 F.3d 561, 565 (2d Cir. 2016).    Further, the business records exception has been construed generously in favor of admissibility, due to the general trustworthiness of regularly kept records and the need for this type of evidence in many cases. *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 421 (S.D.N.Y. 2011). Defendants' affidavits and exhibits meet each requirement for application of this exception.

The affidavits and the exhibits thereto submitted by Defendants qualify for the business records exception to the hearsay rule.  In each instance, a custodian of records affirms his knowledge of those records and his company's record-keeping policies, thus, certifying the

documents and information.  Synchrony Aff. at ¶¶ 3-4; Synch. Supp. Aff. at ¶ 2; MCM Aff. at ¶ 2.  They attest that the records were kept during the course of their company's regularly conducted business activities, and that keeping such records is a regular practice for that company.  Synchrony Aff. at ¶ 11; Synch. Supp. Aff. at ¶ 9; MCM Aff. at ¶ 3.  In Mr. Burger's case, where information came from computer records provided by Synchrony during the sale of Plaintiff's Account, which is permissible under the business records exception, he clearly says as much.  MCM Aff. at ¶ 8.  As Plaintiff acknowledges, "in some circumstances a party may fulfill the requirements of [FRE] 803(6) by incorporating the business records of another."  Pl's Opp. at p. 19.  That is correct in such cases, as here, where all of the indicia of reliability are met.

Plaintiff asserts time and again in her affidavit (and brief) that Midland's documents are a "fabrication," a "falsehood," and "manufactured."  Pl's Aff. at ¶¶ 25, 28 and 39.  There is no evidence that Midland's witnesses are not credible.  If a bald assertion of self-dealing were enough to exclude evidence, there would be no business records exception at all.  It is apparent Plaintiff's claims that Midland's documents are untrustworthy spring from her misunderstanding that, at all relevant times, Gap, Inc. owned Banana Republic and that Banana Republic is just one of Gap, Inc.'s many brands.  Beyond that misapprehension, Plaintiff's claims of foul play are misguided.  Defendants' statements and documents are regularly kept business records and information there from, for the most part from a disinterested third-party, that show all indicia of trustworthiness required for application of the business record exception of FRE 803(6).

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court issue an order granting their Motion to Compel Arbitration, dismissing this action in favor of individual arbitration, and awarding such further relief as the Court deems proper under the circumstances.

New York, New York                    Respectfully submitted,
Dated: August 29, 2016

                                      MARSHALL DENNEHEY WARNER
                                      COLEMAN & GOGGIN, P.C.

                          By:         _____
                                      Joseph A. Hess (JH 1964)
                                      *Attorneys for Defendants*
                                      *Midland Credit Management, Inc.,*
                                      *Midland Funding, LLC and*
                                      *Encore Capital Group, Inc.*
                                      88 Pine Street, 21st Floor
                                      New York, New York 10005
                                      (212) 376-6438
                                      JAHess@mdwcg.com


TO:     Adam J. Fishbein, Esquire
        Adam J. Fishbein, P.C.
        483 Chestnut Street
        Cedarhurst, NY 11516
        (516) 791-4400
        fishbeinadamj@gmail.com

11

# Appendix 1

10-K 1 fy201410-k.htm 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-K**

(Mark One)

☑   Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
    For the fiscal year ended January 31, 2015

☐   Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
    For the transition period from _____ to _____

Commission File Number 1-7562

# THE GAP, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **94-1697231** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |
| **Two Folsom Street, San Francisco, California** | **94105** |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: **(415) 427-0100**

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| **Common Stock, $0.05 par value** | **The New York Stock Exchange** |
| (Title of class) | (Name of exchange where registered) |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act:

| | | Non- | |
|---|---|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ | accelerated filer ☐ | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☑

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of August 1, 2014 was approximately $11.5 billion based upon the last price reported for such date in the NYSE-Composite transactions.

The number of shares of the registrant's common stock outstanding as of March 17, 2015 was 418,771,239.

### Documents Incorporated by Reference

Portions of the registrant's Proxy Statement for the Annual Meeting of Shareholders to be held on May 19, 2015 (hereinafter referred to as the "2015 Proxy Statement") are incorporated into Part III.

## Special Note on Forward-Looking Statements

This Annual Report on Form 10-K contains forward-looking statements within the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. All statements other than those that are purely historical are forward-looking statements. Words such as "expect," "anticipate," "believe," "estimate," "intend," "plan," "project," and similar expressions also identify forward-looking statements. Forward-looking statements include, but are not limited to, statements regarding the following:

- international expansion, including new Gap and Old Navy stores in Asia, additional international outlet stores, increased international online sales, and franchise expansion;

- opening additional Athleta stores;

- Intermix opportunities;

- Piperlime closure;

- product acceptance and consistency improvements, in particular at Gap brand;

- investment in digital capabilities and further enhancement of our shopping capabilities;

- attracting, retaining, and training talent;

- impact of foreign exchange rate fluctuations on financial results;

- impact of West Coast port work slowdowns and stoppages on financial results;

- our ability to supplement near-term liquidity, if necessary, with our revolving credit facility;

- target cash balance and ability to provide for our working capital needs and for unexpected business downturns;

- the outcome of proceedings, lawsuits, disputes, and claims;

- returning excess cash to shareholders;

- the number of new store openings and store closings in fiscal 2015;

- net square footage change in fiscal 2015;

- the number of new franchise stores in fiscal 2015;

- current cash balances and cash flows being sufficient to support our business operations, including growth initiatives and planned capital expenditures;

- cash spending for purchases of property and equipment in fiscal 2015;

- our intent to increase our dividend in fiscal 2015;

- the impact of accounting pronouncements;

- the estimates and assumptions we use in our accounting policies;

- the assumptions used to estimate the grant date fair value of stock options;

- our intention to utilize undistributed earnings of our foreign subsidiaries;

- total gross unrecognized tax benefits;

- expected payments to International Business Machines Corporation ("IBM"); and

- the impact of losses due to indemnification obligations.

Because these forward-looking statements involve risks and uncertainties, there are important factors that could cause our actual results to differ materially from those in the forward-looking statements. These factors include, without limitation, the following:

- the risk that the adoption of new accounting pronouncements will impact future results;

- the risk that we or our franchisees will be unsuccessful in gauging apparel trends and changing consumer preferences;
- the risk that changes in global economic conditions or consumer spending patterns could adversely impact our results of operations;
- the highly competitive nature of our business in the United States and internationally;
- the risk that if we are unable to manage our inventory effectively, our gross margins will be adversely affected;
- the risks to our efforts to expand internationally, including our ability to operate under a global brand structure, foreign exchange fluctuations, and operating in regions where we have less experience;
- the risks to our business, including our costs and supply chain, associated with global sourcing and manufacturing;
- the risks to our reputation or operations associated with importing merchandise from foreign countries, including failure of our vendors to adhere to our Code of Vendor Conduct;
- the risk that trade matters could increase the cost or reduce the supply of apparel available to us and adversely affect our business, financial condition, and results of operations;
- the risk that our franchisees' operation of franchise stores is not directly within our control and could impair the value of our brands;
- the risk that we or our franchisees will be unsuccessful in identifying, negotiating, and securing new store locations and renewing, modifying, or terminating leases for existing store locations effectively;
- the risk that we are subject to data or other security breaches that may result in increased costs, violations of law, significant legal and financial exposure, and a loss of confidence in our security measures, which could have an adverse effect on our results of operations and our reputation;
- the risk that the failure to attract and retain key personnel, or effectively manage succession, could have an adverse impact on our results of operations;
- the risk that our investments in omni-channel shopping initiatives may not deliver the results we anticipate;
- the risk that comparable sales and margins will experience fluctuations;
- the risk that changes in our credit profile or deterioration in market conditions may limit our access to the capital markets and adversely impact our financial results or our business initiatives;
- the risk that updates or changes to our information technology ("IT") systems may disrupt our operations;
- the risk that natural disasters, public health crises, political crises, or other catastrophic events could adversely affect our operations and financial results, or those of our franchisees or vendors;
- the risk that changes in the regulatory or administrative landscape could adversely affect our financial condition, strategies, and results of operations;
- the risk that we do not repurchase some or all of the shares we anticipate purchasing pursuant to our repurchase program; and
- the risk that we will not be successful in defending various proceedings, lawsuits, disputes, claims, and audits.

Additional information regarding factors that could cause results to differ can be found in this Annual Report on Form 10-K and our other filings with the U.S. Securities and Exchange Commission ("SEC").

---

Future economic and industry trends that could potentially impact net sales and profitability are difficult to predict. These forward-looking statements are based on information as of March 23, 2015, and we assume no obligation to publicly update or revise our forward-looking statements even if experience or future changes make it clear that any projected results expressed or implied therein will not be realized.

## THE GAP, INC.
## 2014 ANNUAL REPORT ON FORM 10-K
## TABLE OF CONTENTS

**Page**

**PART I**

Item 1.  Business ... 1

Item 1A. Risk Factors ... 5

Item 1B. Unresolved Staff Comments ... 11

Item 2.  Properties ... 11

Item 3.  Legal Proceedings ... 11

Item 4.  Mine Safety Disclosures ... 12

**PART II**

Item 5.  Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities ... 13

Item 6.  Selected Financial Data ... 16

Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations ... 18

Item 7A. Quantitative and Qualitative Disclosures About Market Risk ... 31

Item 8.  Financial Statements and Supplementary Data ... 32

Item 9.  Changes in and Disagreements With Accountants on Accounting and Financial Disclosure ... 68

Item 9A. Controls and Procedures ... 68

Item 9B. Other Information ... 68

**PART III**

Item 10. Directors, Executive Officers and Corporate Governance ... 68

Item 11. Executive Compensation ... 68

Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters ... 69

Item 13. Certain Relationships and Related Transactions, and Director Independence ... 69

Item 14. Principal Accounting Fees and Services ... 69

**PART IV**

Case 1:15-cv-07195-SJ-RML   Document 23   Filed 08/29/16   Page 22 of 23 PageID #:226

Item 15.  Exhibits, Financial Statement Schedules                                    70

Case 1:15-cv-07195-SJ-RML   Document 23   Filed 08/29/16   Page 23 of 23 PageID #: 227

# Part I

## Item 1. Business.

### General

The Gap, Inc. (Gap Inc., the "Company," "we," and "our") was incorporated in the State of California in July 1969 and was reincorporated under the laws of the State of Delaware in May 1988.

Gap Inc. is a leading global apparel retail company. We offer apparel, accessories, and personal care products for men, women, and children under the Gap, Banana Republic, Old Navy, Piperlime, Athleta, and Intermix brands. Our portfolio of distinct brands across multiple channels and geographies gives us a competitive advantage in the global retail marketplace. In January 2015, we announced our decision to close the Piperlime brand. We expect to close the online platform and the store in New York by the end of the first half of fiscal 2015.

Gap Inc. has Company-operated stores in the United States, Canada, the United Kingdom, France, Ireland, Japan, Italy, China, Hong Kong, and as of March 2014, Taiwan. We also have franchise agreements with unaffiliated franchisees to operate Gap, Banana Republic, and Old Navy stores throughout Asia, Australia, Europe, Latin America, the Middle East, and Africa. Under these agreements, third parties operate, or will operate, stores that sell apparel and related products under our brand names. Our products are also available to customers online through Company-owned websites and through the use of third parties that provide logistics and fulfillment services. Most of the products sold under our brand names are designed by us and manufactured by independent sources. We also sell products that are designed and manufactured by branded third parties, especially at our Piperlime and Intermix brands.

In addition to operating in the specialty, outlet, online, and franchise channels, Gap Inc. is a leader among apparel retailers in using omni-channel capabilities to bridge the digital world and physical stores, creating world-class shopping experiences regardless of where customers shop. The Company's omni-channel services, including order-in-store, reserve-in-store, find-in-store, and ship-from-store, are tailored uniquely across its portfolio of brands.

**Gap.** Gap is one of the world's most iconic apparel and accessories brands anchored in American casual style. Founded in San Francisco in 1969, our collections continue to build the foundation of modern wardrobes - all things denim, classic white shirts, and khakis along with must-have trends.

Gap includes apparel and accessories for men and women, GapKids, babyGap, GapMaternity, GapBody, and GapFit collections. Beginning in 1987 with the opening of our first store outside North America in London, Gap continues to connect with customers around the world through specialty stores, online, and franchise stores. Gap also offers a suite of omni-channel services to its customers in the United States. In addition, we bring the brand to our value-conscious customers, with exclusively designed collections for Gap Outlet and Gap Factory Stores.

**Banana Republic.** Banana Republic is a global apparel and accessories lifestyle brand that delivers modern, covetable style for both men and women. Acquired with two stores in 1983 as a travel and adventure outfitter, Banana Republic has evolved to keep that unique spirit alive while outfitting men and women on the modern day journey of life.

The brand's collections include apparel, handbags, shoes, jewelry, personal care products, and eyewear for men and women at accessible prices. Today, customers can purchase Banana Republic products globally in our specialty and outlet stores, online, and in franchise stores. Banana Republic also offers a suite of omni-channel services to its customers in the United States.

1